[No. S004728. Crim. No. 25802. Oct. 26, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO ESPINOZA, Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Jessica K. McGuire and Wilbur H. Haines III, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, and Anthony L. Dicce, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—This is an automatic appeal from a judgment of death. (Pen. Code, § 1239, subd. (b); unless otherwise indicated all further statutory references are to the Penal Code.)

A jury convicted defendant Antonio Espinoza of these offenses: the first degree murders of Rayna R. and Nancy R. (§ 187); two counts (one as to each victim) of lewd and lascivious conduct by force with a child under the age of fourteen (§ 288, subd. (b)); and, with respect to Nancy R., one count

of forcible rape (§ 261, subd. (a)(2)) and one count of unlawful sexual intercourse (§ 261.5). The jury found to be true four special-circumstance allegations: an allegation that defendant committed the murder of Rayna R. during the course of a lewd and lascivious act upon a child under the age of fourteen (§ 190.2, subd. (a)(17)(v)), an allegation that defendant committed the murder of Nancy R. in the course of a rape (*id.*, subd. (a)(17)(iii)), and two allegations that the defendant was convicted in this proceeding of more than one offense of murder in the first degree (*id.*, subd. (a)(3)). The judgment pronounced by the trial court includes only one of the multiple-murder special-circumstance findings.

We affirm the judgment in its entirety.

## I. Facts

### A. *Guilt Phase Evidence*

On the evening of January 24, 1982, 12-year-old Raquel R., her 13-year-old sister, Nancy R., and Nancy's 13-year-old friend, Rayna R., were standing outside the Headquarters Liquor Store on Charter Way in Stockton. A car containing defendant and another man, Alfredo Reyes, stopped by the girls. Defendant asked them to go for a ride with him and Reyes, but Rayna declined. The girls then accepted a ride from three young men in a car driven by Tommy Golde. As the girls entered Golde's car, defendant said something to Rayna. In her trial testimony, Raquel described the comment as "unfriendly"; she admitted she did not hear exactly what defendant said. The girls rode around for a short time with Golde and his friends and then returned to the liquor store.

Later that evening, Rayna, Nancy, and Raquel went for a ride with Oscar Moreno and three other young men. The group bought some beer and went to an apartment. There, Moreno and Nancy had sexual intercourse, after which Moreno gave Raquel a ride home and dropped off the other two girls on Charter Way.

Late the next morning, while checking an irrigation pump, a ranch foreman found the body of a young girl floating face down in a canal near Bacon Island Road in western San Joaquin County. In response to a dispatch regarding the body, a San Joaquin County Deputy Sheriff went to the canal, where he found a second body about 60 yards from the first. The bodies were those of Rayna and Nancy.

A pathologist testified that Rayna had died from suffocation and blood loss, as the result of six slash-like wounds to her neck, some of which cut

through her larynx. An autopsy revealed a head injury caused by a blunt object, and superficial bruising on Rayna's ear, cheek, chest, forearm and vagina. These injuries had been inflicted within two hours of death.

A gynecologist testified that although the injuries to Rayna's vagina could have been caused by sexual intercourse, they were inconsistent with consensual intercourse. Rayna's body had not yet begun sexual development; she was 4 feet 10 inches tall, weighed 78 pounds, and appeared to be younger than her actual age.

Nancy was 5 feet 3 inches tall and weighed 134 pounds; her body was sexually developed. Small hemorrhages to her vagina were consistent with forcible sexual intercourse. Bruises on her neck suggested manual strangulation; muddy water in her lungs indicated that she had drowned.

Present in the vaginas of both Rayna and Nancy were semen and spermatozoa, which contained secretions of type A and type O blood antigens. Tests revealed Oscar Moreno (with whom Nancy had engaged in sexual intercourse the evening before her body was discovered) and defendant to have type O blood and secrete type O blood agglutinins in other bodily fluids, including semen. A prosecution expert testified that the presence of type A secretions in the victims' vaginas meant that each must have had sexual intercourse with someone having type A blood. The presence of type O secretions, however, could be attributable to an individual with blood type A who secretes blood agglutinins in other bodily fluids, as type A secretors also produce some type O secretions.

In January 1982, when Rayna and Nancy were killed, Jose Uranga lived in an apartment next to defendant's. About 3 o'clock one morning, a few days after the discovery of the girls' bodies, Uranga heard through the apartment wall an argument in Spanish between defendant and another man. The other man said, "You killed them." Defendant responded, "No, we both fucked them." The other man agreed, but added, "You took the knife out and you forced me to kill her." The other man then said he intended to return to Mexico, to which defendant responded, "Don't be a coward, don't go to Mexico. The police will not know anything."

On November 28, 1983, defendant was arrested for the murders of Rayna and Nancy. After advisement and waiver of his constitutional rights, defendant initially denied any knowledge of the two victims or their killings, but then gave this statement: On the evening of January 24, 1982, Alfredo Reyes had insisted on picking up the two young girls. Defendant and Reyes drove with the girls to a deserted area where they paired off in couples, Reyes with

Rayna and defendant with Nancy. While defendant and Nancy were having sexual intercourse, which defendant claimed to be consensual, Reyes called out to defendant and then led him to Rayna's body. Rayna's throat had been cut. Reyes then killed Nancy, despite defendant's efforts to stop him. Defendant fled, but was soon picked up by Reyes who drove him back to Stockton. A couple of weeks later, defendant left for Texas. He never saw Reyes again.

The main thrust of the defense was to discredit the damaging testimony of Jose Uranga, defendant's next-door neighbor, who said he overheard an argument between defendant and a man unknown to Uranga implicating defendant in the killings. Defendant's wife and three other women testified they were in defendant's apartment in January 1982 when the argument was supposed to have taken place but that they did not hear the argument. They said that, because of the small size of the apartment, an argument as described by Uranga would have been heard by everyone else present in defendant's apartment.

Robert Vigil, a relative of defendant's wife, testified that he had twice seen Uranga with Alfredo Reyes, who defendant said was the killer. Vigil later recanted this testimony, saying he had lied at defendant's urging.

Defendant did not testify at the guilt phase of his trial.

## B. *Penalty Phase Evidence*

To establish prior criminal activity by defendant involving the use of force or violence, the prosecution presented evidence of the fatal stabbing of one Luis Ramirez. In October 1978, Brenda Williams (then defendant's girlfriend and the mother of his two children) and Brenda's two sisters had an altercation with Ramirez on a street in Stockton. One of the sisters ran into a nearby bar and returned with her mother, Pat Williams; Pat's boyfriend, Jack Hopper; and defendant. Defendant had a knife. Defendant, Pat, and Hopper chased Ramirez to a vacant lot, where Ramirez fell to the ground. Witnesses testified they saw defendant kneeling over Ramirez making stabbing motions and later cleaning the blade of a knife with a handkerchief. Ramirez died of shock and hemorrhage from multiple stab wounds.

The parties stipulated that on May 30, 1980, defendant had suffered a felony conviction for second degree burglary of a business with intent to commit theft. (§§ 459, 460, subd. (b).)

Testifying in his own behalf, defendant denied he had raped or killed either Nancy R. or Rayna R. Defendant admitted he had stabbed Luis Ramirez, but claimed he had been severely intoxicated at the time.

Defendant described his childhood. His parents separated when he was six years old, after which he lived in various locations in Texas, Nebraska, and California. Shortly before his arrest in this case, he became a "born again" Christian; since then he had been engaged in Bible study and in efforts to convert other jail inmates. Defendant also read at length from letters he had written to his two children and one Vickie Ornelas, a young woman he met after his incarceration.

Vickie Ornelas testified that she met defendant through her church, had known him about four months, and hoped to marry him.

According to defendant's mother, Guadalupe Burciaga, defendant was frequently beaten by his father.

Pat Williams, the grandmother of defendant's two children, described defendant as a loving and responsible parent.

Psychiatrist James Peal attributed defendant's violent behavior to low intelligence and an abusive upbringing. Based upon a clinical interview, Dr. Peal also concluded that defendant manifested symptoms of soft organic brain damage.

## II. GUILT PHASE ISSUES

### A. *Exclusion of Evidence About a Proposed Polygraph Test*

On the day of his arrest, and after advisement and waiver of his constitutional rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436, 439 [16 L.Ed.2d 694, 704, 86 S.Ct. 1602, 10 A.L.R.3d 974], defendant talked to Detective Anthony Coultress of the San Joaquin County Sheriff's Department about the murders of Nancy R. and Rayna R. Initially, defendant disclaimed any knowledge of the murders and denied knowing either the two victims or Alfredo Reyes. Later that day, defendant agreed to take a polygraph examination at the Department of Justice in Sacramento.

Just before the polygraph examination, defendant asked to speak privately with Detective Coultress. After telling Coultress in Spanish that he "wanted to get something off his chest," defendant said he was present when Nancy R. and Rayna R. were killed, but that Alfredo Reyes, acting alone, had killed them. Thereafter, Detective Coultress arranged for defendant to return to Stockton to make a formal statement before a court reporter. In that statement, defendant admitted that he and Alfredo Reyes took Nancy and Rayna

to a remote location in San Joaquin County, where defendant had consensual sex with Nancy, after which Reyes killed the two girls.

Before trial, the prosecutor asked the court to prohibit any reference to the polygraph examination that had been offered to defendant. The court took the matter under submission. Before the court ruled on the issue, defense counsel told the jury in his opening statement that the evidence would show that defendant had agreed to submit to a polygraph examination. Immediately, the court ordered counsel's reference to the polygraph examination stricken from the record, and admonished the jury not to consider it. Later, out of the jury's presence, the court warned counsel against any mention of the polygraph examination without first obtaining a ruling from the court. Twice thereafter, the court told the attorneys not to refer to the proposed polygraph examination of defendant without first making an offer of proof outside the jury's presence.

During his cross-examination of Detective Coultress, and without seeking any prior ruling from the court, defense counsel mentioned defendant's trip to Sacramento, where the polygraph test was to be administered. The court adjourned to chambers with both counsel, defendant, and Detective Coultress. The court told Coultress not to mention the lie detector test unless it was with the court's permission, adding there was a statutory prohibition (see Evid. Code, § 351.1) against the admission of polygraph-related evidence. Thereafter, defense counsel offered to waive any rights defendant might have under the statute in question; defendant personally agreed to this waiver. Defense counsel explained he wanted the jury to know that "there was an offer of a polygraph [test] and that [defendant] was taken to the place where the polygraph was." When trial proceedings were resumed, there was no further mention of the polygraph.

■ Defendant now contends the trial court's exclusion of evidence that defendant was facing a polygraph examination when he made the statement to Detective Coultress was unsupported by state law and violated his right to due process under the Fourteenth Amendment to the federal Constitution. Assuming defendant has adequately preserved the issue for appeal, we conclude these contentions lack merit.

Evidence Code section 351.1 provides that the results of a polygraph examination "shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." The statute also excludes evidence of "an offer to take" or the "failure to take" such a test. ■ The statute, which was enacted in 1983 as an urgency measure by a two-thirds vote of the membership in each house of the Legislature (see

Sen. Bill No. 266, Sen. Final Hist., 1983-1984 Reg. Sess., p. 185; Stats. 1983, ch. 202, § 1, pp. 667-668) was intended to create an exception to the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) that "relevant evidence shall not be excluded in any criminal proceeding." (See Assembly Com. on Crim. Law and Pub. Safety, staff comments on Sen. Bill. No. 266 as amended Mar. 16, 1983 (1983-1984 Reg. Sess.), for hg. on June 8, 1983, p. 2.)

In precluding the use of polygraph results in criminal proceedings, unless stipulated to, Evidence Code section 351.1 codifies a rule that this court adopted more than 30 years ago in *People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577], in which we said that polygraph test results "do not scientifically prove the truth or falsity of the answers given during such tests." Subsequent to *Jones*, in *People* v. *Thornton* (1974) 11 Cal.3d 738, 764 [114 Cal.Rptr. 467, 523 P.2d 267], we upheld the exclusion of evidence of a suspect's willingness to submit to a polygraph examination, rejecting the defense argument likening such willingness to a " 'badge of innocence.' " As we explained: "[B]ecause lie detector tests themselves are not considered reliable enough to have probative value, 'a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.' " (*Ibid.*)

Evidence Code section 351.1 and our decision in *People* v. *Thornton*, *supra*, 11 Cal.3d at page 764, amply support the exclusion of evidence about the proffered polygraph test.

In an effort to distinguish this case from *People* v. *Thornton, supra,* 11 Cal.3d 738, defendant argues that evidence that he was facing a polygraph examination when he made the statement to the police was not so much a "badge of innocence" as an esential factor in assisting the jury in its assessment of the truth or falsity of that statement. In that statement, defendant admitted his involvement in the events leading to the deaths of Nancy R. and Rayna R. but disclaimed responsibility for their killings. Defendant asserts that the fact he was facing a lie detector test when he made that statement enhanced the credibility of his version of the facts.

Defendant fails to persuade us that his case is distinguishable from *Thornton, supra,* 11 Cal.3d 738. There we rejected defendant's contention

that evidence of his willingness to take a polygraph examination showed his innocence; here, the argument is that the evidence of the proffered test supports the truth of defendant's claim of innocence. The distinction defendant draws is one without a difference.

Defendant argues that even if exclusion of the evidence was proper under state law, it violated his right to due process under the federal Constitution. In support, defendant cites certain decisions of the United States Supreme Court holding that the application of state procedural or evidentiary rules that barred a defendant from making an effective challenge to the prosecution's case or from presenting crucial exculpatory evidence violated the federal Constitution. (See *Davis* v. *Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 354-355, 94 S.Ct. 1105] [prohibiting defendant from confronting and cross-examining adverse witnesses]; *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 294-295 [35 L.Ed.2d 297, 308-309, 93 S.Ct. 1038] [same]; *Washington* v. *Texas* (1967) 388 U.S. 14, 23 [18 L.Ed.2d 1019, 1025-1026, 87 S.Ct. 1920] [prohibiting the defense from calling a favorable percipient witness]; *Green* v. *Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 741, 99 S.Ct. 2150] [precluding presentation at the penalty phase of a capital case of evidence that a codefendant had admitted sole responsibility for the murder].) These cases are distinguishable from the situation here. Exclusion under Evidence Code section 351.1 of defendant's "offer to take" a polygraph test at most prevented presentation of evidence that might have bolstered defendant's credibility. Defendant was, however, not foreclosed from effectively challenging the prosecution's case or from presenting crucial exculpatory evidence. There was no due process violation.

### B. *Animosity Between the Prosecutor and Defense Counsel*

Defendant points to more than 100 on-the-record exchanges between the prosecutor and defense counsel that indicate an acrimonious relationship between the two attorneys. They include objections to questions asked by either counsel, a few instances of bickering between counsel over an objection or a ruling, and several accusations by defense counsel that the prosecutor was reacting to a particular question or ruling by "making faces" or was whispering too loudly to the investigating officer seated at counsel table. The following exchanges are illustrative:

"Mr. Hawk [defense counsel]: Well, do I have an objection or is he going to give me a lecture?

"Mr. Wall [prosecutor]: I am responding to his objection.

"Mr. Hawk: You're barbarian.

"Mr. Wall: You're putting on a show."

On one occasion, when the prosecutor objected to defense counsel's "friendly parroting banter" with a witness, defense counsel retorted, "The shoe is on the other foot?" In another instance, the prosecutor remarked that defense counsel should "refrain from making comments like 'Oh Jesus Christ.' "

On yet another occasion, referring to defense counsel's handling of an exhibit, the prosecutor asked that the record reflect that defense counsel had commingled laboratory samples with other evidentiary containers and envelopes. When defense counsel queried whether his treatment of the exhibit made any difference, the prosecutor responded with apparent sarcasm, "Hard to tell now."

Defendant contends that the frequent acrimonious exchanges between his counsel and the prosecutor created a "carnival atmosphere" uncontrolled by the trial court, depriving him of a fair trial before an impartial jury as guaranteed by the Fourteenth Amendment of the United States Constitution, and resulting in a penalty determination based on "caprice or emotion" incompatible with the Eighth Amendment. The record does not support this contention.

The exchanges between trial counsel to which defendant refers comprise but a small portion of a trial that extended over 10 months. By defendant's own description, most of these exchanges were "petty." Several took place outside the jury's presence and thus would not have been heard by the jurors. Those that were made in front of the jury were not protracted, and generally were promptly interrupted by the trial court when it warned counsel not to make personal comments, or ordered a recess, or admonished the jury to disregard any personal comments made by the prosecutor and defense counsel.

Contrary to defendant's assertions, the acrimony that the attorneys exhibited towards each other during trial was not sufficiently extensive or uncontrolled to deprive defendant of a fair trial or to impair the reliability of the jury's penalty determination; thus, defendant's constitutional rights were not violated.

Recognizing that his own trial attorney initiated much of the rancor, defendant nonetheless faults the prosecutor for engaging in "misconduct." We disagree.

It is the duty of every member of the bar to "maintain the respect due to the courts" and to "abstain from all offensive personality." (Bus. & Prof.

Code, § 6068, subds. (b) and (f).) ■ A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State. (*People* v. *Kelley* (1977) 75 Cal.App.3d 672, 690 [142 Cal.Rptr. 457].) As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564]; *People* v. *Kelley*, *supra*, 75 Cal.3d 672, 680-689.)

■ A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619], citing *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 642-643 [40 L.Ed.2d 431, 436-437, 94 S.Ct. 1868].) But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776], quoting *People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Included within the deceptive or reprehensible methods we have held to constitute prosecutorial misconduct are personal attacks on the integrity of opposing counsel. (*People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].)

■ Here, we are satisfied there was no denial of due process under the federal Constitution. The prosecutor's behavior, though on occasion rude and intemperate, did not comprise a pattern of egregious misbehavior making the trial fundamentally unfair. In this lengthy trial, the prosecutor's lapses from courteous demeanor were occasional rather than systematic and pervasive.

Nor has defendant demonstrated prejudicial misconduct under state law. None of the instances that defendant characterizes as prosecutorial misconduct appears to have been either intended or likely to deceive the jury on any material issue. Moreover, it is not reasonably likely that the jury would have understood the prosecutor's bickering with defense counsel, or his use of

facial expressions or gestures to express dismay or disbelief, to be a personal attack on defense counsel's integrity. In all likelihood, the jury viewed such behavior as expressing merely a clash of personalities. Thus, it is not reasonably probable that the prosecutor's occasional intemperate behavior affected the jury's evaluation of the evidence or the rendering of its verdict. (*People* v. *Strickland, supra,* 11 Cal.3d 946, 955; *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243].)

C. *Trial Court's Failure to Inquire Whether a Certain Juror Might Have Been Sleeping During the Presentation of Testimony*

During the prosecutor's preliminary direct examination questioning of a witness, the defense attorney asked for a brief conference in chambers. Thereafter, out of the jury's presence, defense counsel mentioned that a certain juror "appeared" to be asleep. When the trial court replied it had not observed any sleeping juror, defense counsel did not press the matter, but suggested only that the interruption of the testimony and the adjournment had likely awakened the juror.

■ Defendant now contends that the trial court's failure to determine whether, in fact, the juror had been sleeping was error requiring reversal. We reject this contention.

A trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his [or her] duty, . . ." (§ 1089, 5th par.) Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251].) We have recently explained, however, that the mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case. (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1234 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

Here, defense counsel stated that, after watching the juror in question for "several seconds," he thought the juror "appeared" to be asleep. Counsel's mere speculation that the juror *might* have been sleeping, which was insufficient to apprise the trial court that good cause to discharge might exist, did not obligate the court to conduct any further inquiry.

D. *Juror's Comment on a Defense Witness*

One of the defense witnesses was Andora Russo, the 17-year-old niece of defendant's wife. At the time of the killings of Rayna R. and Nancy R.,

Russo lived with defendant and his wife in their apartment. Russo's testimony was quite short, essentially consisting of her denial that she had heard the early-morning argument between defendant and another man about the killings.

At the conclusion of Russo's testimony, the court recessed the trial for five minutes. Thereafter, defense counsel advised the court that his investigator had heard a juror make a comment that counsel interpreted to be about Ms. Russo.

Sworn as a witness, the investigator testified that as he was leaving the courtroom, followed by three or four male jurors, he overheard this fragment of a comment by one of the jurors, "that 21-year-old body looking as bad as mine." The trial court concluded that the comment could not have been about Russo, because she had just testified that her age was 17. Defense counsel then said that the juror's comment was probably not significant.

■ Defendant now argues that the trial court erred in failing to inquire further into the possibility that the jurors committed misconduct by discussing defense witness Russo or her testimony. We disagree.

A court on notice of the possibility of juror misconduct must undertake an inquiry sufficient " 'to determine if the juror should be discharged and whether the impartiality of other jurors had been affected.' " (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1175 [270 Cal.Rptr. 286, 791 P.2d 965], quoting *People* v. *McNeal* (1979) 90 Cal.App.3d 830, 839 [153 Cal.Rptr. 706], italics omitted.) As mentioned above, the trial court in this case did conduct such an inquiry. Immediately after defense counsel raised the issue, the court questioned the defense investigator. His testimony failed to establish that the three jurors were discussing defense witness Russo, and provided no basis from which to infer that any juror had engaged in misconduct. Under these circumstances, no additional inquiry was warranted.

E. *The Trial Court's Failure to Admonish the Jurors Under Section 1122*

During the trial of a criminal charge, the court must admonish the jurors at each adjournment "that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." (§ 1122.) ■ Defendant contends the trial court erred in failing to give this admonition at the close of the two court days immediately preceding the testimony of defense witness Russo.

Although the record reflects that the trial court failed to give the statutorily mandated admonition on the days in question, defendant demonstrates

no prejudice. Defendant's only theory of prejudice is that omission of the admonition resulted in a conversation between jurors about the testimony of defense witness Russo. To establish that such a conversation occurred, defendant cites the testimony of a defense investigator, which we discussed in the preceding section, that the investigator overheard a fragment of a conversation between three jurors. But, as we have already concluded, the investigator's testimony is insufficient to establish that the jurors discussed Russo's testimony. Accordingly, defendant has not shown he was prejudiced by the trial court's omission of the jury admonition. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 173-174 [246 Cal.Rptr. 673, 753 P.2d 629].)

## F. *Instructional Error*

In instructing the jury, the trial court explained the possible verdicts on the homicide charges, the relationship between the lesser included offenses on those charges, and how the jury's foreperson was to complete the verdict forms. In explaining that as to count I (Rayna R.) and count V (Nancy R.) the first verdict form pertained to murder in the first degree, the court said: "If you find beyond a reasonable doubt that it's murder in the first degree, this would be the form that your foreman signs." The court then said that the second verdict form was for second degree murder and that the foreperson should sign that form if the jury convicted defendant of second degree murder.

With respect to the third verdict form provided for counts I and V, the court stated: "The next verdict form has to do with the lesser included offense. If you're convinced beyond a reasonable doubt that the defendant is not guilty of the first two, then you can consider a lesser included offense, the voluntary manslaughter, and if you're convinced beyond a reasonable doubt that he's guilty of voluntary manslaughter then you sign this verdict."

██ Defendant argues that this statement to the jury improperly shifted to him the obligation to prove his innocence, thereby violating his right to due process by alleviating the prosecution's burden to prove guilt beyond a reasonable doubt (see *Carella* v. *California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419], and rendering the resulting verdict unreliable under the Eighth Amendment standard applicable in capital cases (*Beck* v. *Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 402-403, 100 S.Ct. 2382]). We disagree.

Although apparently inadvertent, the trial court's statement, viewed alone, did suggest to the jury that a verdict of *not* guilty had to be proven beyond a reasonable doubt. But a single instruction is not to be viewed in "artificial

isolation"; instead, it must be evaluated "in the context of the overall charge." (*Cupp* v. *Naughten* (1973) 414 U.S. 141, 146-147, 94 S.Ct. 396, 400 [38 L.Ed.2d 368, 373-374, 94 S.Ct. 396]; *People* v. *Morris* (1991) 53 Cal.3d 152, 227-231 [279 Cal.Rptr. 720, 807 P.2d 949] [considering mistyped instruction in context and in light of other instructions]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 215-216 [260 Cal.Rptr. 583, 776 P.2d 285].)

Here, the instructions to the jury also included the standard instruction on reasonable doubt, CALJIC No. 2.90 (1979 rev.): "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his [or her] guilt is satisfactorily shown, he [or she] is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him [or her] guilty beyond a reasonable doubt." In addition, the court gave CALJIC No. 17.10, advising the jury that if it "is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged and it unanimously so finds, it may convict him of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense." (CALJIC No. 17.10 (1984 rev.).)

These two instructions clearly told the jury that the prosecution, not the defendant, bore the burden of proving guilt beyond a reasonable doubt, and that the jury was to consider the lesser included offense (voluntary manslaughter) only after its determination that the prosecution had failed to prove, beyond a reasonable doubt, that defendant was guilty of the greater offense (murder). In light of these specific instructions, there is no reasonable likelihood that the jury would have understood the trial court's brief and apparently inadvertent misstatement to mean that the defendant had the burden of proving, beyond a reasonable doubt, that he was innocent of the charged offenses of murder. (*Estelle* v. *McGuire* (1991) 502 U.S. __, __ [116 L.Ed.2d 385, 399, 112 S.Ct. 475, 482, fn. 4]; *Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 328-329, 110 S.Ct. 1190, 1198].)

### III. PENALTY PHASE ISSUES

#### A. *Jury Consideration of Defendant's Subornation of Perjured Testimony*

Jose Uranga, whose apartment was next to defendant's at the time of the killings in this case, testified for the prosecution at the guilt phase of the trial. Uranga said he heard, through the apartment wall, an argument between defendant and another man implicating defendant as the killer of the two girls. Uranga could not identify the other man in the argument, nor did he know Alfredo Reyes, defendant's companion at the time of the killings.

To counter Uranga's testimony that he did not know Alfredo Reyes, defendant called Robert Vigil as a witness. Vigil, a relative of defendant's

wife, testified that he had once seen Uranga, whom Vigil knew only as "the Spaniard," talking with Alfredo Reyes in the stairwell near Uranga's apartment. Vigil also said he had seen "the Spaniard" and Alfredo Reyes seated together in an automobile; on that occasion, Uranga had his arm around Reyes's shoulder.

When the prosecution recalled Vigil as a witness later at the guilt phase of the trial, Vigil recanted his earlier testimony, and explained that defendant had asked him to lie about seeing Uranga and Reyes together. In his closing argument at the guilt phase, the prosecutor argued that, by urging Vigil to lie at the trial, defendant had "suborned perjury." The prosecutor described "perjury" as a "crime that goes to the heart of our jury trial system."

Later, during argument at the penalty phase of the trial, the prosecutor again mentioned defendant's subornation of perjury, arguing that it belied the claim of defendant (who had testified at the penalty phase that he was a "born again" Christian) to be "a person who tries to live a Christ-like life."

▇▇▇ Defendant now argues that evidence that he asked Vigil to lie under oath at the guilt phase of the trial would not have been admissible as evidence in aggravation under the California capital sentencing scheme (§ 190.3). He also asserts that such evidence had no bearing on his personal responsibility and moral guilt, and thus its consideration by the jury deciding penalty violated the Eighth Amendment of the federal Constitution. (*Enmund* v. *Florida* (1982) 458 U.S. 782, 801 [73 L.Ed.2d 1140, 1154, 102 S.Ct. 3368]; see also *Payne* v. *Tennessee* (1991) 501 U.S. ___, ___ [115 L.Ed.2d 720, 729-730, 111 S.Ct. 2597, 2604]; *Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733].)

Not in dispute is that testimony of defendant's subornation of perjury was properly before the jury in its determination of guilt. Thus, when the same jury later had to decide what penalty to impose, it already knew of the perjury. Defendant contends, however, that because of the jury's knowledge of that evidence, which he asserts was not appropriate for penalty determination, the trial court had a duty to instruct the jury on its own motion not to consider that particular evidence in its penalty determination. We disagree.

In *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782], we explained that section 190.3 "excludes" from consideration at the penalty phase all evidence of criminal conduct by the defendant except evidence of other felony convictions admissible under factor (c) of that section and of activity involving defendant's "use or attempted use of force or violence . . . or the express or implied threat to use force or violence"

similarly admissible under section 190.3, factor (b). Defendant points out that he has suffered no felony conviction for subornation of perjury and that the conduct, although criminal, is nonviolent. Thus, defendant argues, the perjury evidence was improperly before the jury at the penalty phase. But, as we shall explain, the evidence was proper for jury consideration at the penalty phase to rebut mitigating evidence offered by defendant that since his Christian conversion three weeks before his arrest in this case he has tried to live a "Christ-like life."

In specifying the type of evidence of criminal conduct by a defendant that would be admissible as part of the prosecution's case-in-chief at the penalty phase under factors (b) and (c), *People* v. *Boyd, supra,* 38 Cal.3d at page 776, did not limit the jury's consideration of evidence offered by the prosecution as rebuttal. (*Ibid.* ["prosecution rebuttal evidence would be admissible . . . to 'disprove any disputed fact that is of consequence to the determination of the action.' "].) The scope of such rebuttal evidence must be specific, however, and "must relate directly to a particular incident or character trait" the defendant has offered in mitigation of penalty. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113]; accord, *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 143-144 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Ramirez, supra,* 50 Cal.3d at p. 1193.)

Here, at the penalty phase of his trial, defendant testified he became a "born again" Christian after the killings of the two girls but before his arrest in this case. Defendant explained that, while in county jail awaiting trial, he had actively ministered the Gospel to other inmates. To rebut the implication from this testimony that defendant's behavior since his conversion was exemplary, the prosecutor during closing argument reminded the jury of instances after that conversion when defendant had been less than candid. It was in that context that the prosecutor referred to defendant's having suborned the perjured testimony of Robert Vigil. This reference, which related directly to a character trait that defendant himself had put in issue, was proper rebuttal.

Because we conclude that the jury could appropriately consider at the penalty phase evidence that defendant had in this case induced Vigil to give perjured testimony, defendant was not entitled to an instruction directing the jury not to consider it.

B. *Instructional Errors*

Defendant contends that the trial court erred when it instructed the jury on the aggravating and mitigating factors listed in section 190.3 without deleting therefrom the inapplicable mitigating factors. We have on many occasions rejected this contention. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 475

[6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Ramirez, supra*, 50 Cal.3d at p. 1198; *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

This is also true of defendant's additional assertion that the trial court erred in not stating which of the factors listed in section 190.3 were mitigating and which were aggravating. Contrary to defendant's claim, the court's failure to do so in this case did not constitute an arbitrary denial of any state-created right. (See *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]; *Harris* v. *Vasquez* (9th Cir. 1990) 913 F.2d 606, 625.) Such an instruction is not compelled under state law. (*People* v. *Bacigalupo, supra*, 1 Cal.4th 103, 148-149; *People* v. *Andrews, supra*, 49 Cal.3d 200, 233.)

 Defendant further contends that the trial court should have instructed the jury to restrict its consideration of aggravating factors to those specifically listed in section 190.3. Such an instruction is appropriate only when extraneous aggravating evidence not falling within any of the statutory factors has been presented to the jury. (See *People* v. *Sully* (1991) 53 Cal.3d 1195, 1242 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1324 [248 Cal.Rptr. 834, 756 P.2d 221].) Here, the evidence did not warrant such an instruction. There was no error.

C. *Consideration at Penalty Phase of Unadjudicated "Other Crimes" Evidence by the Same Jury That Had Decided Guilt*

Defendant argues that consideration at the penalty phase, by the same jury that had earlier decided his guilt, of evidence of violent criminal activity of which defendant had not been convicted (the murder of one Luis Ramirez) violated his right to due process under the Fourteenth Amendment to the federal Constitution, and renders the resulting death judgment unreliable under the Eighth Amendment. We have in the past rejected a similar contention, and decline to reconsider it. (*People* v. *Bacigalupo, supra*, 1 Cal.4th 103, 136; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205, and fn. 32 [222 Cal.Rptr. 184, 711 P.2d 480].)

D. *Ruling on the Automatic Application to Modify the Verdict by Judge Who Did Not Hear the Entire Guilt Phase Trial*

The guilt phase of defendant's trial commenced before Judge Kenneth Ferguson, who conducted the proceedings until, during the presentation of

the defense, he became too ill to continue with the trial.[1] The presiding judge of the San Joaquin County Superior Court then assigned Judge K. Peter Saiers to substitute for Judge Ferguson pursuant to section 1053, granting Judge Saiers "the same power, authority and jurisdiction as if the trial had been commenced before [him]." (*Ibid.*)

Defendant moved for a mistrial, asserting that the midtrial substitution violated his Sixth Amendment right to jury trial by denying him the same judge throughout the entire trial. Judge Saiers denied the motion, and after reviewing the transcript of the proceedings, presided over the remainder of the guilt phase and the entire penalty phase of the trial.

At the conclusion of the penalty phase, the jury returned a verdict imposing the death penalty. Over the same objection that the defense had made in its mistrial motion, Judge Saiers, after reviewing the relevant evidence, denied defendant's automatic application for modification of the jury's death penalty verdict (§ 190.4, subd. (e)).

Defendant now contends that the midtrial substitution of Judge Saiers for Judge Ferguson and Judge Saiers's subsequent ruling on defendant's automatic application for modification of the jury's death penalty verdict (§ 190.4, subd. (e)) violated his jury trial rights under the federal and state Constitutions (U.S. Const. VI, XIV; Cal. Const., art. I, § 16). We reject this contention.

The notion that the federal right to *jury* trial is violated by the midtrial substitution of a *judge* has its origin in a 1915 federal case, *Freeman* v. *United States* (2d Cir. 1915) 227 Fed. 732. That case held that the Sixth Amendment right to a trial by jury entitled a criminal defendant to 12 jurors, as well as a judge, "all of whom must remain identical from the beginning [of trial] to the end." (*Id.*, at p. 759.) Recently, in *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1211 [275 Cal.Rptr. 729, 800 P.2d 1159], we mentioned *Freeman* and more recent authorities (*Randel* v. *Beto* (5th Cir. 1965) 354 F.2d 496, 500 and fn. 5; 2 Wright, Federal Practice & Procedure: Criminal 2d (1982) § 392, pp. 402-403) as providing "abstract support" for the proposition that the right to jury trial includes a trial before a single trial judge. Because the defendant in *Gonzalez* had not objected to the temporary substitution of a judge during jury deliberations of the guilt phase of his trial, we saw no reason to address the merits of the federal court's holding in *Freeman*. We do so now.

---

[1]Judge Ferguson was undergoing chemotherapy treatments for cancer.

Underlying the holding in *Freeman* v. *United States, supra,* 227 Fed. at page 759, was the premise that the Sixth Amendment of the federal Constitution preserved the right to a jury trial exactly as it existed at English common law, including the peculiar feature that the same judge must preside throughout the entire jury trial. That premise, as we shall explain, was faulty.

In 1970, 55 years after the circuit court's decision in *Freeman,* the United States Supreme Court held that the Sixth Amendment did not preserve the common law right to a trial by a jury consisting of 12 persons, rejecting the "easy assumption" from its own past decisions that the federal Constitution necessarily had retained every feature of the common law jury trial. (*Williams* v. *Florida* (1970) 399 U.S. 78, 92-93 [26 L.Ed.2d 446, 455-456, 90 S.Ct. 1893].) The high court observed that the right to a trial by jury was intended to prevent "oppression by the Government." (*Id.,* at p. 100 [26 L.Ed.2d at p. 461], citing *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 156 [20 L.Ed.2d 491, 499-500, 88 S.Ct. 1444].) This essential purpose, as the court explained, is served by "the interposition between the accused and his accuser of the commonsense judgment" of laypersons (*ibid.*) at a trial presided over by a neutral judicial officer. This aspect of the right to jury trial was not implicated here by the midtrial substitution of Judge Saiers for Judge Ferguson, which was compelled by Judge Ferguson's serious illness and inability to continue with the trial.

Similarly, we reject defendant's related argument, which is devoid of legal support, that the substitution in question violated his right to a jury trial under the state Constitution. (Cal. Const., art. I, § 16.)

We now turn to defendant's next contention. Because Judge Saiers replaced Judge Ferguson midtrial, Judge Saiers did not hear all of the guilt phase testimony, specifically the testimony of Jose Uranga that he had overheard an argument between defendant and an unidentified man implicating defendant as the killer of Rayna R. and Nancy R. Because Judge Saiers did not personally hear this testimony, and thus could not possibly evaluate Uranga's credibility, defendant asserts, Judge Saiers could not fully exercise his independent judgment of the evidence for purposes of ruling on defendant's application under section 190.4, subdivision (e) to modify the jury's death penalty verdict. Consequently, defendant argues, Judge Saiers's denial of the motion was inherently unreliable under the heightened standard of scrutiny required by the Eighth Amendment in death penalty cases, and thus necessitates reversal of the judgment. Defendant urges that the matter be remanded—for the sole purpose of ruling on the modification request—to Judge Ferguson, who has recovered from his serious illness and continues to serve as a judge of the San Joaquin Superior Court. We disagree.

Section 190.4, subdivision (e) provides that a trial judge ruling on an application for modification of a verdict of death shall "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented."

In *People* v. *Rodriguez, supra,* 42 Cal.3d at page 793, we described the "independent judgment" review required under subdivision (e) of section 190.4 as a process in which the trial judge must "assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence." Seizing on this statement, defendant attempts to read into the statutory provision a requirement that, in ruling on a defendant's application for modification of the jury's verdict of death rendered at the penalty phase, the requisite assessment can be made only by a judge who has personally heard the testimony presented at the guilt phase of the trial. Not so.

A judge ruling on an application for modification of a jury verdict of death does not make an independent and de novo penalty determination, but rather independently reweighs the aggravating and mitigating evidence to decide whether "in the judge's independent judgment, the weight of the evidence supports the jury verdict." (*People* v. *Mincey, supra,* 2 Cal.4th 408, 477; *People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) As we have acknowledged in cases that were reversed and remanded for reconsideration of an application for modification of a death verdict, it is not always possible that the judge who conducted the penalty phase in a capital case be the one to reconsider the application on remand; in that event, "the matter may be heard before another judge of the same court." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 963 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204].)

In this case, defendant's application for modification of the jury's verdict of death was considered by Judge Saiers who, after replacing the seriously ill Judge Ferguson, reviewed the transcripts of the trial proceedings before his substitution and presided over the remainder of the guilt phase and the entire penalty phase. Under these circumstances, we reject defendant's contention that Judge Saiers could not fully exercise his independent judgment of the evidence for the purpose of ruling on defendant's application for modification of the jury's verdict of death.

## IV. Conclusion

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied December 17, 1992, and the opinion was modified to read as printed above.