Filed 6/24/21  P. v. Thomas CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B305293 |
| Plaintiff and Respondent, | Los Angeles County |
| | Super. Ct. No. |
| v. | MA075592-01 |
| CAMREN DEJHAUNAE THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shannon Knight, Judge.  Affirmed.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael Keller and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Camren Dejhaunae Thomas of committing felony mayhem and misdemeanor assault during a fight after a high school basketball game.  He appeals, and we affirm.

**BACKGROUND**

An information charged Thomas with two counts of felony assault on Ken C. and Brandon B. by means of force likely to produce great bodily injury (Penal Code,[1] § 245, subd. (a)(4), counts 1 and 2); one count of felony mayhem against Ken C. (§ 203, count 3); and two counts of misdemeanor battery against Alaijian R. and Josiah T. (§ 242, counts 4 and 5).[2]

1.    *Prosecution evidence*

The events described at trial happened in January 2019, after a high school basketball game between teams from San Pedro and Quartz Hill.  Ken C., a Quartz Hill player, was walking out of the gym with his teammates Brandon B., Alaijian R., Dan E., and Josiah T.  Their coach was waiting in the team van.  Dan E. said something about "two other dudes trailing behind us."  The two people (who were not players on the other team) overheard him, asked if he had a problem, and became aggressive.  Ken C. and the other Quartz Hill players stood there without throwing any punches, and then walked toward the team van, while the two people went back into the gym.

Ken C., who was wearing headphones, saw his teammates turn around.  He began to turn around and saw Thomas running

---

[1]    All subsequent statutory references are to the Penal Code.

[2]    Thomas was 18 years old at the time of the charged offenses, but the victims were minors, so we use their first names and last initials.  The information also charged a codefendant, Porsha Kiyana Bryant, who is not a party to this appeal.

out of the gym at him.  Without saying anything, Thomas hit him in the jaw.  Ken C. stumbled, but caught himself.  Two other people ran up and starting hitting him with "body shots," but one of his friends pulled them off.

Ken C. realized his jaw was "leaking" and he couldn't talk. He gathered up his things and got into the team van.  His coach was outside the van trying to break up the fights.  Brandon B. was fighting off four people.  Thomas hit Brandon B., who dropped and was out cold for two minutes.

Ken C. went to the hospital, where they gave him morphine.  After the swelling went down, he had surgery for a bilateral fracture in his jaw.  A metal plate was inserted on each side of his chin.  His face was very swollen for a week, and his teeth still did not close evenly.  For a month he could not open his mouth more than an inch, ate only liquid food, and was unable to speak.  Ken C. went back to school two months later, but he had multiple seizures and could not play basketball.

Ken C. had no contact with Thomas during or after the game.

Brandon B. testified to "a little scuffle" toward the end of the basketball game.  Josiah T. had tried to save a ball that was headed out of bounds, and the ball hit Thomas, a player on the San Pedro team.  Thomas and Josiah T. got into each other's face.  Brandon B. got between them and said:  " 'Break it up.  It's basketball.' "  He complimented Thomas on his tattoos, and "it was cool after that."  There was no penalty.  The teams were playing hard, and the crowd was unusually loud.

When the game was over, Brandon B. left the gym with four other Quartz Hill players:  Dan E., Josiah T., Alaijian R., and Ken C.  As they walked away, two people approached and

asked if they had a problem.  Brandon B. said no and continued to walk.  He turned around and saw at least 10 more people coming out of the gym with the two people who had followed them.  Thomas ran out of the gym, and without saying anything, hit Ken C. in the face.  Ken C. immediately started to bleed heavily from the mouth.

Brandon B. fought with someone else and then saw Josiah T. getting "stomped" in the bushes, so he jumped in between Josiah T. and his two or three attackers to help. He was pushing and pulling people off Josiah T., and then he saw Alaijian R. getting hit by a woman and a man.  When Brandon B. ran over to pull them off, someone hit him on the jaw. He didn't see who hit him; it all happened very fast.  He came to in a female friend's arms, unable to stand.  The paramedics took him to the hospital, where they cleaned his bloody mouth. Brandon B. had suffered a concussion, and he did not play basketball for a month.

Quartz Hill coach Bernard Nichter testified that during the entire game, a group of San Pedro supporters was yelling derogatory things from behind the Quartz Hill bench.  At the end of the game a ball hit Thomas but the referees jumped in immediately.  After his team lost to San Pedro, Nichter went out to the parking lot, pulled the van up, and waited for his players. He saw Thomas go straight at Ken C. and punch him.  Nichter got out of the van.  Ken C.'s mouth was hanging open and bleeding, and he took a tooth out of his mouth and handed it to Nichter.  Nichter grabbed Ken C. and put him in the van to calm him down and see how badly he was hurt.  Ken C.'s jaw was broken and blood was gushing out.  Nichter called

4

Ken C.'s mother and yelled for someone to call the sheriff and the paramedics.

Nichter saw a skirmish on the other side of the van. Thomas and two others were on top of Josiah T. He pulled them off and they started hitting and kicking Alaijian R. Nichter and Josiah T. pulled them off Alaijian R. They then jumped back onto Josiah T., while Nichter held Alaijian R. back. When Brandon B. tried to help Josiah T., they jumped on Brandon B., hitting and kicking him. Brandon B. fell to the ground, and Nichter ran over to pull Thomas and the two others off. More than 20 people were in the parking lot, and it was "absolute chaos." A woman first acted as if she wanted to help Brandon B., but then she punched and kicked him before Nichter managed to pull her off. Brandon B. was unconscious, with his eyes rolled back in his head.

Josiah T.'s face was badly swollen and bruised the next day. Alaijian R. was bruised too.

A deputy who arrived at the chaotic and crowded scene found Ken C. in the back of an ambulance, bleeding from the mouth and unable to talk, with a badly swollen jaw. Brandon B. was on the ground being tended to by paramedics. When he tried to stand up, he fell right back over. The other injuries were not serious.

A security guard ran out to the parking lot after three to four San Pedro fans who were chasing down a Quartz Hill player, who then fell to the ground, bleeding from the mouth. A second Quartz Hill player was unconscious, and a third player was beaten up in the bushes. The San Pedro fans ran to two or three cars and took off.

Steven Young, the chief referee, testified he saw San Pedro players running toward Quartz Hill players who were preparing

to get into the van. Thomas punched a Quartz Hill player in the face with no provocation. A melee began with fights breaking out everywhere. Thomas and several others punched a second Quartz Hill player, who went down hard and lost consciousness. A woman handed off her child and kicked the unconscious player in the head. Young ran to him and fended off additional attackers. When the second player came to, he was delirious. Young was not sure whose punch had knocked the player out. The Quartz Hill coach was crying.

## 2. *Defense evidence*

Corey Walsh, a special education teacher and football coach at San Pedro High School, testified Thomas was in his special education caseload and played in the football program. Thomas was aggressive on the field but not in normal life. Walsh had seen him pull two boys off one of his friends in an altercation during football practice, and never saw him start a fight. Thomas was calm, respectful, and playful, although he could be naïve and impulsive.

Walsh admitted he had approached the mothers of two of the victims outside the courthouse. When he told them he was Thomas's football coach, one cursed at him and the other calmed her down. He was just trying to get their side of the story, and although he felt attacked, he stayed calm. He did not intend to influence their testimony.

A special education support provider at Thomas's high school testified she met with him monthly. He was calm, peaceful, and shy, and never aggressive or violent.

Thomas's aunt testified she was at the gym entrance after the game. Her godsons Taj and Conroy left, and then Taj ran back in saying, "[T]hey are jumping us." People from the

6

bleachers started going out, and Thomas went outside with the crowd. Twenty-five to 30 people were fighting.

Thomas testified that during the game he tried to save a ball going out of bounds. The ball hit Ken C. in the groin, and Ken C. got a little upset. Thomas changed out of his uniform after the game. As he started to leave the gym, Taj ran back in and yelled that his brother was being jumped. When Thomas went outside, Conroy was backing up slowly, exchanging words with four or five Quartz Hill players. Thinking Conroy might get hit, Thomas pushed him back with his left hand and told him to go to the car. He looked to see what was happening. He then looked to his left and didn't see Conroy. When Ken C. stepped forward and raised his hand, Thomas thought he was going to be hit. He reacted by hitting Ken C. once in the cheek. Ken C. stumbled and ran off. Thomas's coach told him to leave.

### 3.    *Rebuttal evidence*

In rebuttal, Brandon B.'s mother testified Walsh approached her and Ken C.'s mother outside the courthouse. Walsh asked if they thought their sons had anything to do with Thomas's attacks on them. His demeanor was intimidating. Ken C.'s mother asked Walsh to walk away, and she took Walsh's photograph when he refused. He asked them why, and Brandon B.'s mother answered: " 'Because you're harassing me.' "

The jury convicted Thomas of misdemeanor assault on Brandon B. (§ 240), a lesser crime of the felony assault charged in count 2, and felony mayhem against Ken C. as charged in count 3. The jury acquitted Thomas of the battery charges in counts 4 and 5. The jury deadlocked on count 1, felony assault on Ken C., and the court declared a mistrial.

7

The trial court sentenced Thomas to the midterm of four years on the mayhem count, suspended execution of the sentence, and placed Thomas on five years' formal probation and ordered him to serve 364 days in county jail. The court ordered Thomas to serve a consecutive 180 days in county jail on count 2, and to perform 60 days of community labor. The court also ordered Thomas to complete an anger management counseling program, and imposed fines and fees as we describe below.

Thomas filed this timely appeal.

## DISCUSSION

1.  ***The trial court did not abuse its discretion when it declined to investigate following a note from the jury***

During deliberations, the jury requested clarification of the instructions and a readback of the testimony of Young, Ken C., and Coach Nichter. The jury then sent a note stating it was deadlocked. The next morning, the court read the note: "We are currently stuck at a 8-4 deadlock. We were at an 8-4 deadlock throughout Friday deliberation. We have heard all the evidence including the readback of the testimonies. We understand the interpretation of the law. However, at this point we have ceased deliberation due to a lack of evidence that is necessary to alleviate the reasonable doubt that exists amongst some of us. We are unanimous for four counts, but we are deadlocked for one count. *In addition, the subject of race has been brought up amongst one of our jurors towards another juror.* We are wondering what is our path forward." (Italics added.)

Defense counsel objected to the court's proposed special instruction on a deadlocked jury, which was based on language approved in *People v. Whaley* (2007) 152 Cal.App.4th 968, and *People v. Moore* (2002) 96 Cal.App.4th 1105. The prosecutor

8

supported the instruction, but added: "My main concern is . . . it sounds like there may be some other issues in that jury room if they are bringing each other's race into question in their deliberations. I don't know if the court wants to investigate that further." The court offered to read the instruction telling the jurors not to take race into account or to let it influence the verdict, "but I'm reluctant to inquire about it since they don't say what the context is for that." If the jury continued to be deadlocked, "the court would inquire as to whether it is due to a general disagreement or a failure to deliberate by one or more jurors." The court thought the note meant there was a general disagreement, but if both sides wanted "the court to inquire and, if they all indicate that they are hopelessly deadlocked, declare a mistrial as to whichever count it is, I can do that." The prosecutor asked for the instructions. The defense asked the court not to give the jury instructions, and to declare a mistrial on the deadlocked count.

The court called the jury into the courtroom and reread CALCRIM No. 200 telling the jury not to allow bias based on race or other factors to influence its decision. The court also read the special instruction.

The jury retired, and then sent a new note: "We have implemented upon your guidelines and we have deliberated in a respectful manner. However, we still remain deadlocked at 8 to 4 for the remaining count. What is our path forward at this point?" Both counsel agreed with the court's stated intention to bring the jurors out, ask if there was anything further the court could do to encourage them to reach a verdict, and verify the deadlock was based on a genuine disagreement rather than a failure to deliberate. If nothing further could be done, the court would

9

take the verdicts on the other counts and declare a mistrial on the count that was the subject of the deadlock.

The jury returned to the courtroom with another note stating it was still deadlocked on one count. The court inquired, and the foreperson answered the deadlock was on count 1 (felony assault on Ken C.). The foreperson stated they had taken six ballots and the split was eight to four throughout. The court polled the individual jurors, all of whom stated the jury was hopelessly deadlocked and further deliberations would be futile. The court found the jury was deadlocked on count 1, and declared a mistrial as to count 1 only.

Thomas argues the trial court violated his constitutional rights when it failed to investigate whether the statement in the jury's note (that one juror brought up the subject of race to another juror) meant at least one juror was racially biased. We review for an abuse of discretion the court's decision not to conduct a hearing or detailed inquiry. (*People v. Keenan* (1988) 46 Cal.3d 478, 532, 539; *People v. Ray* (1996) 13 Cal.4th 313, 343.)

An impartial jury is one in which no juror is incapable or unwilling to decide the case solely on the evidence at trial. (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) If the trial court finds a juror is unable to perform this duty because the juror is actually biased, the court may discharge the juror and substitute an alternate. (*People v. Keenan*, *supra*, 46 Cal.3d at p. 532.) Once the court is on notice that there may be good cause to discharge a juror, the court has a duty to conduct whatever inquiry is reasonably necessary. But the court also must protect the sanctity of deliberations, and "not every incident involving a juror's conduct requires or warrants further investigation."

10

(*People v. Cleveland* (2001) 25 Cal.4th 466, 478, 484.)  Before conducting any inquiry into allegations of misconduct, it is often appropriate to reinstruct the jury and to permit the jury to continue its deliberations.  (*Id*. at p. 480.)  When reinstruction does not resolve the problem, and the court is on notice there may be grounds to discharge a juror during deliberations, then the court has a duty to conduct whatever inquiry is reasonably necessary.  (*Ibid*.; see *People v. Espinoza* (1992) 3 Cal.4th 806, 821.)

The note stated that race had been brought up between two jurors.  It did not state that one or both jurors displayed racial bias.  The court reinstructed the jury not to be influenced by racial bias and to continue to deliberate.  The jury's next note stated the jury had "implemented upon your guidelines and . . . ha[d] deliberated in a respectful manner."  This told the court the jury had heeded the court's repeated instructions (including on racial bias), but still could not resolve the vote split on count 1.  The court called the jury out, verified unanimity was impossible, and with the prior agreement of defense counsel, declared a mistrial on count 1.

The trial court did not abuse its discretion in not conducting further inquiry.  The second note from the jury informed the court that, following reinstruction, the jury had deliberated respectfully.  And (although this is not determinative), the trial court's declaration of a mistrial on Count 1 was defense counsel's requested response to the jury's note.

## 2. *No substantial evidence supported an instruction on defense of another*

During a discussion of jury instructions, defense counsel requested "a defense of another instruction." The trial court stated the evidence did not show defense of others. Thomas had testified his initial concern was for Conroy, but he had pushed Conroy back, and then Ken C. raised his arm. The evidence supported a self-defense instruction, but not that Thomas thought at that moment anyone else was in danger. Counsel responded, "I see." The court gave a self-defense instruction but did not instruct on defense of another.

The doctrine of "defense of another" requires evidence the defendant reasonably believed, first, that a third party was in imminent danger of suffering bodily injury, and, second, the immediate use of force was necessary to defend against that imminent danger to the third party. (CALCRIM No. 3470; *People v. Abelino* (2021) 62 Cal.App.5th 563, 579, fn. 13.)

Thomas testified he thought Conroy might get hit, so he pushed Conroy back with his left hand and told him to go to the car. Thomas looked to see what was going on, then looked to his left and did not see Conroy. When Ken C. stepped forward and raised his hand, Thomas thought he himself would get hit, so he hit Ken C. This testimony shows that Conroy was out of the way and out of Thomas's sight before Ken C. raised his hand, and is not substantial evidence that Thomas reasonably believed Conroy was in imminent danger. Thomas does not point to any other evidence that he acted in defense of another. The trial court properly refused to give an instruction unsupported by the evidence.

12

### 3. *Fines and fees*

The trial court ordered Thomas to pay a restitution fine of $300 (§ 1202.4); a stayed $300 probation revocation fine (§ 1202.44); a stayed $300 parole revocation fine (§ 1202.45); $80 in court security fees (§ 1465.8); and a $60 conviction assessment (Gov. Code, § 70373). Thomas argues the imposition of those fines and fees without a determination that he had an ability to pay violated due process, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164. *Dueñas*, decided in January 2019, held that due process of law requires a trial court to determine a defendant's present ability to pay before imposing court facilities and court operations assessments or a restitution fine. (*Id.* at pp. 1164, 1172.)

Although Thomas's February 4, 2020 sentencing hearing was more than a year after the *Dueñas* decision, he did not object to the imposed costs. This typically forfeits the right to challenge the fines and fees on appeal. *(People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 856-859; *People v. McCullough* (2013) 56 Cal.4th 589, 596-597.) Applying this general rule, we conclude Thomas forfeited the issue. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155.)

In supplemental briefing, Thomas argues his counsel was ineffective when she did not object. We reject this claim because he has not shown a reasonable possibility of prejudice. His sentencing memorandum stated he had been on the way to college with a football scholarship, came from a humble background, had lost his mother before the incident, had been a participant in a homeless student program, and was enrolled in special education, as among other mitigating factors why he should not receive a prison sentence. This record does not

13

establish he was indigent and unable to pay.  "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  This is not that rare appellate record.

### DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



LAVIN, J.