Filed 2/6/13  P. v. Tyler CA3
Received for posting 3/19/13

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>ZACHARY TYLER,<br><br>       Defendant and Appellant. | C062508<br><br>(Super. Ct. Nos. 07F01565,<br>06F06452) |

A jury found defendant Zachary Tyler guilty of second degree robbery (Pen. Code, § 211)[1] in case No. 06F06452.  In case No. 07F01565, a jury in another trial found defendant guilty of attempted murder (§§ 664/187, subd. (a)) and second degree robbery (§ 211) with an enhancement for being armed with a firearm (§ 12022, subd. (a)(1)).

---

[1] Undesignated statutory references are to the Penal Code.

1

The trial court imposed a total term of 55 years four months, plus 65 years to life in case Nos. 07F01565, 06F06452, and 07F01299.[2] Defendant contends on appeal that the prosecutor committed misconduct in the closing argument in case No. 07F01565. We affirm.

## FACTUAL BACKGROUND[3]

### The Robbery and Attempted Murder

On the night of January 29, 2007, Barbara Peoples heard gunshots and then banging at the front of her house. She opened the front door to find a man standing on the porch and a white Cadillac on her front lawn. The man, Raymond Amayao, fell onto the front porch and said he had been shot. He was in pain and appeared "quite apprehensive and afraid." He said he did not want to die and mentioned that he had three children. When Peoples called 911, the operator instructed her to ask Amayao who shot him. Peoples asked Amayao if he knew and he replied "no."

Sacramento Police Officer Casey Dionne interviewed Amayao in the ambulance as he was being transported to the hospital. Amayao said he had parked his car at the Evergreen Shopping Center off Mack Road when a white 1980's Buick with four to six occupants pulled up next to him. Amayao heard someone yell out to shoot him, and a man in the driver's side rear seat with two- to three-inch dreadlocks and a gold grille pointed a nickel-plated semiautomatic handgun at him. The man shot at Amayao, hitting him once in the shoulder and twice in the abdomen. Amayao was evasive with the

---

[2] Defendant filed a separate appeal in case No. 07F01299. (See *People v. Tyler* (Jan. 26, 2012, C062512) [nonpub. opn.].)

[3] Since defendant makes no contentions regarding case No. 06F06452, we dispense with a recitation of the facts in that case and summarize only the facts established at the trial in case No. 07F01565.

officer, and said he did not know why he was at the Evergreen Shopping Center or where he was going. He said he did not know why he was shot or who had done this to him.

On January 31, 1997, Amayao was interviewed at the hospital by Sacramento Police Officer Kevin Howland. Amayao said he passed a car he described as a 1988 to 1991 white Buick Park Avenue when he pulled into the Evergreen Shopping Center parking lot. He parked near a liquor store, and one of the Buick's occupants called him over.

Amayao walked to the car and saw that there were five people in the car, including three males, one sitting in the driver's seat, one in the front passenger seat, and one in the driver's side rear seat. The man behind the driver asked Amayao to help jump-start a car. Amayao agreed, and followed the Buick in his car.

The Buick left the shopping center, went down Center Parkway, turned onto a side street and parked, with Amayao pulling off the road behind the Buick. The man in the rear driver's-side seat who had asked for the jump-start left the Buick and approached the passenger side of Amayao's car. He rested one hand on the roof of Amayao's car and pointed a faded, gold-colored semiautomatic pistol at Amayao with the other hand and told him to "break yourself," which Amayao understood to mean he was being robbed. The man entered Amayao's car and Amayao gave the man $24 in cash.

The man from the front passenger seat then exited the Buick. Shortly after Amayao gave the money to the robber, someone yelled "shoot him, shoot him." The man with the gun then shot Amayao several times. He continued shooting as Amayao drove away, shooting out the rear window of Amayao's car. Amayao continued to drive until he crashed into a house and asked for help. Amayao thought he could identify the occupants of the rear seat on the driver's side and the front passenger seat of the car.

On February 8, 2007, Sacramento Police Detective Brian Dedonder interviewed Amayao at his home. Amayao reiterated that someone from a white Buick called out to him after he had parked at the Evergreen Shopping Center. A man in the driver's-side

rear seat asked for help jump-starting a car that was parked around the corner. Amayao agreed and followed the Buick, parking behind it when the Buick pulled over on a nearby street. The man who asked for the jump-start came up to Amayao's car, opened the passenger door, leaned in, and pointed a gun at Amayao, telling him to "break yourself." Amayao then gave the man $24. He believed the man in the front passenger seat got out of the car, walked behind the robber and told the robber to shoot him. The robber, who had been calm, got very excited and started shooting at Amayao. The man continued to shoot at Amayao as he drove off, shooting out the back window of his car.

This time Amayao described the gun as dark colored and kind of bronze, "like the kind you see in a western movie." He thought the shooter touched the roof with his other hand as he leaned into the car. Amayao identified codefendant Anthony Richard as the shooter and robber in a photographic lineup. He was unable to identify defendant or codefendant David Griffin in separate photographic lineups.

Dedonder asked Amayao why he told the first officer who interviewed him that the shooting had taken place at the shopping center rather than around the corner. Amayao responded that he was in pain, just wanted to get to the hospital, and did not want to talk.

### The Victim's Testimony

Amayao has a 2004 felony conviction for transportation of a controlled substance from Solano County. At the time of the robbery and shooting here, Amayao lived with his fiancée and their three children in south Sacramento.

Amayao testified that he remembered driving his 1991 Cadillac on the day he was shot, and that the car was damaged during the shooting. He stated that he did not recall what he was doing the day he was shot, nor did he recall talking to the police at the scene of the crash or in the ambulance. He identified himself on a security video getting out of his car, but said he did not remember going to the Evergreen Shopping Center.

4

Amayao further testified that he could not recall seeing a man from the back seat of a white Buick pointing a nickel-plated revolver at him. He said he had no memory of talking to Detective Howland or any details of their conversation. He remembered talking to a detective at his home; he identified a person in a photographic lineup, but testified he was not sure that it was the person who shot him.

Looking at defendants in court, Amayao said he never saw defendant or the codefendants on the day he was shot. He said he did not remember telling a deputy district attorney that he was afraid. But he admitted he did not want to come to court and testify. Amayao lives in Sacramento with his fiancée and their four children, but said he was not afraid about testifying.

Former Sacramento County Deputy District Attorney Larenda Delaini was assigned to the case in July 2007.[4] She met with Amayao on July 31, 2007 and August 8, 2007. Amayao was uncooperative during both visits, and made it clear he did not want to be part of the process. Amayao's body language and demeanor at both meetings indicated he was scared. Amayao did not want to come to court because he did not want the defendants or their family members to see him. At a third meeting on August 16, 2007, Amayao admitted he was scared for his family, telling Delaini he already had three children and his fiancée was pregnant.

Delaini met Amayao again on August 21, 2007. As in every previous meeting, Amayao said he did not remember the incident. Delaini told Amayao she knew he remembered the incident and that he was afraid. After telling Amayao he would look pretty silly if he claimed not to remember after she presented the evidence, Amayao said he remembered what happened, but was extremely fearful for himself, his fiancée, and

---

[4] Delaini did not participate in defendant's trial. The case was taken over by another deputy when Delaini was transferred to another division. Delaini was employed as a deputy attorney general at the time of the trial.

5

their children.  Amayao said he was trying to move his family from where they presently lived to get away from it all.  After he was shown a video of him parking at the Evergreen Shopping Center, Amayao smiled and said, "I'll tell you."  Amayao was still scared, but more open after that.  He denied that the incident was a drug deal gone bad.

### Other Evidence

Surveillance videos from the Evergreen Shopping Center on the night of the incident showed two men getting out of a car and entering the liquor store.  After they were in the store for some time, they left the liquor store and got back into the car.  The parties stipulated that defendant and codefendant Anthony Richard were the individuals depicted in the video.  From the video, Detective Dedonder determined defendant and Richard were riding in a white Buick, which was registered to Dewayne Knorr.  Defendant was the driver of the Buick.

Defendant's ex-girlfriend, Barbara Knorr, confirmed the Buick in the video was hers, although it was registered to her father, Dewayne Knorr.  She allowed defendant to drive the car, and he was driving it on January 29, 2007.

Richard was arrested on February 13, 2007, after an officer saw him leaving a local apartment.  Officers searching the apartment found a loaded .22-caliber revolver and a sock containing eleven .357-caliber bullets.  Officers contacted a man at the residence who claimed to be Mark Butler, but they later determined he was codefendant David Griffin, Richard's half brother.

Amayao told Detective Dedonder that the seized .22-caliber revolver depicted in a photograph was the same color as the gun used to shoot him, but he was not certain it was the same gun.  A bullet fragment was extracted from the tire of Amayao's car.  The fragment was from a .22-caliber bullet, which could have been discharged from the .22-caliber firearm found in Richard's apartment.  Knorr had seen codefendants Richard and Griffin with the firearm.

6

A latent print from the top left of the rear passenger door of Amayao's car was matched to codefendant Griffin.

Gunshot residue particles found on the interior front passenger seat of Amayao's car, near the driver's seat, indicated that a gun had been discharged into the vicinity of where those particles were found. Two of the three components of gunshot residue were found on Amayao's hand. Those particles could have been the result of Amayao moving his hand in a defensive posture at the time he was shot. Or the particles could have gotten on his hand by touching his gunshot wounds. There were a number of things that could explain the presence of those particles on Amayao's hands, including the possibility that Amayao fired a gun.

## DISCUSSION

Defendant asserts various statements from the prosecutor during closing argument were prejudicial misconduct. Anticipating that we will find the contention forfeited because trial counsel did not object to the alleged misconduct, defendant also contends the failure to object to the statements was ineffective assistance of counsel. We disagree with both contentions.

## I. Forfeiture

Defendant asserts misconduct in three portions of the prosecutor's closing argument: (1) the prosecutor's statements that it is common for witnesses and victims to recant and that CALCRIM No. 318 was created for such situations, (2) that Amayao could not leave the state or change his identity after the trial, and (3) defendant would be guilty even if Amayao was trying to buy drugs from the defendants.

A prosecutor's conduct violates the federal Constitution when it is so egregious it renders the trial unfair and constitutes a denial of due process. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) Under California law, conduct by a prosecutor that does not render a trial unfair is nevertheless misconduct if it involves the use of deceptive or reprehensible methods in an attempt to persuade the court or jury. (*People v. Espinoza*

7

(1992) 3 Cal.4th 806, 820.)  To preserve a claim of prosecutorial misconduct for appellate review, a defendant must timely object and request an admonition, unless an admonition would be futile.  (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1358.)

Defendant did not object to the prosecutor's arguments he now claims were improper, and there is no indication his objections would have been futile.  Thus, defendant's misconduct contentions are forfeited.

## II.  Ineffective Assistance of Counsel

A conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-689, 691-692, 693-694 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) __ U.S. __, __ [178 L.Ed.2d 624, 642, quoting *Padilla v. Kentucky* (2010) 559 U.S. __ [176 L.Ed.2d 284, 297].)

To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *Ledesma*, *supra*, 43 Cal.3d at p. 218.)

### A.  Argument about the Victim's Recantation

While discussing Amayao's conduct and testimony, the prosecutor made the following statements:

"What [Amayao] did was self-preservation.  He told us that without telling us. His demeanor in court.  His previous statements regarding his concern and the fact that we know he was nearly killed the last time he saw these people tells us that.

8

"There is nothing different than what Mr. Amayao did than many other things we maybe experienced in our own lives. For example, a woman who is abused by her husband suffers a bruise. Tells the neighbor, oh, no, he didn't hit me. I ran into the cupboard. Self-preservation.

"Mr. Amayao, Raymond Amayao is looking out for his self [*sic*] and his family and he couldn't do it here in court.

"Thank goodness we have other evidence in that he talked to detectives when he felt safe before he felt what he felt when he sat in that chair.

"Now, let's move on to the facts of this case. Now, there's a special jury instruction for situations exactly like what happened with Mr. Amayao in this particular case. And that's because unfortunately or fortunately depending on your viewpoint what happened here, I don't remember, different stories, refusal to admit things, unwillingness to talk about things; *it's pretty common.*

"*It's pretty common* for any number of reasons. One of which is the reason we talked about here. Fear, and survival, and self-preservation.

"What does the law say about this? This is CALCRIM instruction 318 and when you go back in the jury room you're going to have a copy of this and you can take a look at it. You heard evidence[,] statements that a witness made prior to trial and here I'm talking only about Mr. Amayao. You heard several different statements that he made prior to trial.

"What do you do with that information? What is useful for you to do? What does the law allow you to do?

"You can use it two ways. The statement, the out of court statement.

"Number one; to evaluate whether the witness's testimony in court is believable. Now, Mr. Amayao's testimony in court that he doesn't remember[,] that part's not believable. Most of the other things he told us when he gave his answer[,] that is believable. And we'll go into that later on.

9

"But the second thing here is key.  What is the other way that you can use those statements in [*sic*]?

"As evidence that the information in those statements is true.  There is nothing wrong with you basing a verdict in this case or any other case based on belief beyond a reasonable doubt in the prior statements of Mr. Amayao.

"It makes no difference whatsoever so long as you believe those prior statements what he does here in court [*sic*].

"This jury instruction tells you about that.  *And it's exactly for scenarios like this because it is not uncommon for witnesses and for victims to do what Mr. Amayao did or to give statements in court that are different for any motivation than the ones they gave outside of court.*  That is what you have to focus on."  (Italics added.)

Defendant asserts the italicized portions of the argument quoted above improperly vouched for Amayao and relied on facts outside the record -- that it is common for witnesses and victims to recant at trial.

It is misconduct for a prosecutor to argue evidence outside the record.  (*People v. Frye* (1998) 18 Cal.4th 894, 976 (*Frye*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  However, " 'a prosecutor is given wide latitude during argument. . . .  It is . . . clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience . . . .' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)  The reviewing court must consider the alleged misconduct in the context of the prosecutor's entire argument (*People v. Dennis* (1998) 17 Cal.4th 468, 522) and may not " 'lightly infer' that the jury drew the most damaging rather than the least damaging meaning from [those] statements" (*Frye, supra*, 18 Cal.4th at p. 970).  We also keep in mind that the failure to object to argument "seldom establishes counsel's incompetence. [Citations.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 772.)

The prosecutor began her remarks on this issue by suggesting that what Amayao did on the witness stand was no different than "many other things we maybe experienced in our own lives." The prosecutor went on to argue what has come to be common knowledge. It is an unfortunate reality for many people in many neighborhoods that cooperating with the police and providing testimony about violent crime in court engenders feelings of fear and trepidation. It is not inaccurate to say that refusing to cooperate is seen as a way of surviving. Indeed, avoiding the perception of being a "snitch," a "rat" or a "tattle-tale" is not new. Feigning lack of memory, changing one's story, refusing to admit what was said before, and being uncooperative are common stratagems employed to avoid pointing the finger, not just in trials but in many other aspects of life, including incidents that occur between children in the home and in the school setting. The prosecutor simply pointed out what is common knowledge.

Moreover, defendant was not prejudiced by this argument. The reference to victims generally recanting was made in the context of a larger and more specific argument that Amayao's testimony should not be believed because it was a product of his fear for himself and his family. The prosecutor's comment about CALCRIM No. 318 was nothing more than an argument that that instruction applied to Amayao's statements as it would apply in any situation where a person recanted an earlier statement.

Defendant asserts the evidence does not support an argument that Amayao believed he would face repercussions if he testified truthfully at trial. He argues Amayao specifically testified he was not scared, and his statements to Delaini do not support an inference that he was afraid of reprisal if he told the truth on the stand. Defendant claims Amayao could have been reluctant to testify because the defendants were angry at him for falsely implicating them in his statements to the police. Finally, defendant speculates Amayao's desire not to be involved in the case could be rooted in the realization that the law enforcement officials would be unhappy with him when he revealed at trial "that he had incorrectly implicated the defendants."

11

We disagree. While defendant's interpretation of the evidence is possible, albeit highly unlikely, the evidence strongly supports an inference that Amayao was afraid of testifying out of fear of reprisal. Amayao told Delaini in multiple interviews he did not remember what happened. When he finally admitted remembering the events, Amayao said he was afraid for himself and his family. Delaini also testified that Amayao's conduct and body language showed he was afraid during their conversations.

The prosecutor's argument makes the entirely plausible inference that Amayao's trial testimony, where he could not recall the incidents was, like his refusal to remember the incident when being interviewed by Delaini, a product of fear which should not be believed. This argument was based on the evidence and was proper.

Trial counsel need not raise futile objections to forestall ineffective assistance claims. (*Frye, supra*, 18 Cal.4th at p. 985.) Since the prosecutor's argument was not misconduct, the failure to object was not ineffective assistance.

### B. Argument about the Victim's Fear

In addressing Amayao's credibility, the prosecutor made the following argument:

"[Amayao] told Larenda Delaini I'm trying to move my family out of the area. I'm trying. Well, he told us here in court we still live here.

"*When he gets off the witness stand and he walks out of that courtroom he goes home to this area. He doesn't get to fly out to another state to go assume another identity. He lives with people looking at his face knowing his name and living in this town.*

"What is worse for him than what's already happened. Something happening to his family.

"And that was what Raymond Amayao was concerned with. And that is self-preservation. He came in here and he told us without telling us I can't do this, I'm not willing to do this because of what has already happened and what he fears in the future.

12

"That does not make him untrustworthy and that doesn't make what he has already told us and which is corroborated by a lot of other evidence that we'll get to later untruthful or bothersome in any event. It makes him a human being who cares about his family.

"Bottom line. You don't have to like what Raymond Amayao did. Would it have been easier if he came in and repeated verbatim what he had told the detectives? Maybe. Maybe not."

Defendant contends the italicized portion of the argument is an improper appeal to the jury's prejudice and passions by urging them to imagine the victim's suffering, and was unsworn testimony about defendant's future dangerousness.

Again, we disagree. This argument was made just before the passage regarding Amayao's recanting, which we discussed in Part II.A. of the Discussion, *ante*. The prosecutor was not asking the jury to convict defendant because Amayao has suffered or defendant presents some future danger. Placed in its proper context, the passage is part of a larger argument that Amayao recanted out of understandable fear, which makes his trial testimony not credible, but does not diminish the credibility of his pretrial statements. The reference to "people looking at his face knowing his name and living in this town" was not directed at defendant and did not imply defendant's future dangerousness. Amayao had told Delaini he was concerned that defendants and their family members would see him if he testified. The prosecutor's comment was likely understood to relate to Amayao's fear that his face would become known to whomever was in the courtroom, including the defendants' families, and that he would inevitably have to return to his neighborhood known as a person who had cooperated with the authorities and pointed the finger at defendants in court.

Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. (Evid.Code, § 780; *People v. Warren* (1988) 45 Cal.3d 471, 481.) Testimony a witness is fearful of retaliation also relates to that witness's credibility

13

and is admissible.  (*People v. Malone* (1988) 47 Cal.3d 1, 30.)  Since such evidence is clearly admissible under Evidence Code section 780, argument based on the evidence, like the prosecutor's argument here, is proper.

Again, since the prosecutor's argument was not misconduct, the failure to object was not ineffective assistance.

## C.  Purported Misstatement of Law

During the defense closing arguments, counsel for defendant and codefendants argued Amayao was not credible because he lied to the officers about why he was at the shopping center and lied at trial about being unable to remember the details of the incident.  Counsel suggested Amayao's actual purpose at the shopping center was to buy illegal drugs.

The prosecutor responded to these arguments on rebuttal, stating:

"Think about it.  When you're Raymond Amayao you're bleeding and you're thinking of your children and you're trying to live, and officers asking you why you went to a liquor store which has nothing to do with why you got shot other than everything kind of started there, is that important or relevant to you?  Of course not.

"What if he gives a detailed statement about [*sic*]?  The detailed statement from Officer Dionne about the car.  About the description of the person that shot him.  All of those things are important and relevant.  Him saying I don't know what I was doing there, I don't know where I was going, none of that makes a bit of difference.

"Because you know what, it doesn't matter when you look at this or any other case what Raymond Amayao was doing.

*"Doesn't matter.  I will tell you we would still be here -- everyone will tell you this, we would still be here in this case if Mr  Amayao was shot and Mr  Amayao was attempting to be murdered by these guys, they took his money if he did agree to go around the corner and buy dope.  Let's just put it out there; right.*

14

*"Let's just say for some reason, and I'm not suggesting that this is the case. Please understand that. If Mr. Amayao made an arrangement to go buy drugs from someone and that's why he went around the corner and everything else in his statement is accurate, Anthony Richard gets out, he's got the gun, he says break yourself, he gives him $24*[,] *Raymond Amayao gets shot, we're still here in court.*

"*They're still guilty of the crime. They're' still guilty of the crime.* The status of the victim whether they're sympathetic, whether they're a good Samaritan, whether they're not a nice person, whether they have a felony conviction, none of that matters to ending up here in court.

"Victims are victims. Prosecution doesn't pick victims. Judges don't pick the victims. You know who picks the victims? The defendants. They picked Mr. Amayao. It is their choice why he ended up here in this courtroom. And even if he did anything other than what he said, which is go to the liquor store, none of that makes a difference.

"He makes an agreement to go around the corner and buy God knows what from these guys, a gun, drugs, fill in the blank, none of it matters because it doesn't make them innocent.

"They would still sit here and they would still be guilty even if that were the case. None of that matters. . . ."

Defendant contends the italicized portion of this passage improperly stated the law regarding his liability as an aider and abettor. A person aids and abets the commission of a crime when he or she, with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of the crime, by act or advice, aids, promotes, encourages or instigates the commission of the crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Defendant argues that if he drove the Buick around the corner to facilitate a drug deal, without more evidence, he would have lacked the knowledge of the robbery and attempted murder necessary to be liable as an aider and abettor. From this, defendant concludes the prosecutor misstated

15

the law because defendant could not be guilty if Amayao went around the corner to buy drugs.

Defendant's contention rests on a fact not found in the prosecutor's hypothetical -- that defendant drove the Buick around the corner intending to facilitate a drug deal without knowledge the others intended to rob Amayao. The prosecutor did not say that. Her argument does not assume any facts other than that Amayao may have gone around the corner to buy contraband.

Thus, the conclusion that follows from defendant's misreading of the prosecutor's argument -- that he cannot be liable as an aider and abettor if Amayao intended to buy drugs that night -- is wrong. If defendant drove the car around the block, knowing the codefendants offered drugs to Amayao and planned to rob him once Amayao followed them around the corner, defendant would be guilty as an aider and abettor even if Amayao intended to buy drugs from them.

In context, the prosecutor's argument was likely understood as an assertion that it did not matter what Amayao was doing when he was robbed, shot and seriously wounded -- he was still victimized. Defendant has not shown a reasonable likelihood that the jury construed or applied the prosecutor's comments in the way he suggests. (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)

Indeed, in her opening argument, the prosecutor accurately discussed what the prosecution had to prove to establish aider and abettor liability. The prosecutor told the jury, "The aider and abettor has to know of the perpetrator's intent. Their unlawful purpose. And the aider and abettor has to specifically intend to do something to help him. . . facilitate the crime one way or the other." Later, in discussing the second and third element of aiding and abetting, the prosecutor told the jury, "The defendants Griffin and Tyler . . . knew that Anthony Richard intended to commit the crime. They knew it. That's the second element. [¶] Before or during the crime Griffin and Tyler intended to

aid and abet Richard in committing the crime. They did something to help with the knowledge of what was going on."

Having earlier told the jury defendant had to have knowledge of his codefendant's unlawful purpose, we do not see how the jury could have understood the prosecutor to later say defendant would be guilty even if he unwittingly drove the car around the corner not knowing his passengers intended to rob the victim.

Since the prosecutor correctly stated the law, counsel did not provide ineffective assistance by failing to object. (See *Frye, supra*, 18 Cal.4th at p. 985.)

## DISPOSITION

The judgment is affirmed.

MURRAY , J.

We concur:

ROBIE , Acting P. J.

BUTZ , J.

17