Filed 11/15/13  P. v. Bondiek CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIKE LOUIS BONDIEK,<br><br>    Defendant and Appellant. | G047030<br><br>(Super. Ct. No. 11HF2355)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Maureen M. Bodo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Mike Bondiek appeals following a conviction of driving under the influence of alcohol. He argues there was insufficient evidence to find him guilty, and further claims the prosecutor committed prejudicial misconduct by failing to admonish two witnesses not to refer to excluded evidence. He also contends he is entitled to additional presentence credits due to a change in the relevant statute which he argues should be applied retroactively. We find that none of these arguments have merit, and therefore affirm.

I

FACTS

On the afternoon of July 18, 2011, Sandra Zoepfel drove into a south Orange County gas station. She saw a car that appeared to be disabled in the driveway and drove around it. Defendant was in the driver's seat of that car. After parking, Zoepfel and her passenger, Laura Torres, approached defendant's car with the idea of pushing it out of the driveway. Torres asked defendant if he needed help, but he did not respond. He was looking down at the passenger seat and putting items into a bag. Zoepfel realized the car could not be pushed because it seemed to be disabled, with damage to the right side of the vehicle and the axle, with one tire apparently folded underneath the car.

By this time, another driver, Solomon Ortiz, had parked and approached to assist in moving defendant's car. He also observed the axle damage and bent front wheel. (At trial, Ortiz thought the engine was running, but in a prior hearing, he said the engine had been off.)

Zoepfel approached the driver's side door and noticed that defendant appeared to be intoxicated. He responded to her in a way that did not appear to be "normal" and had a strong odor of alcohol coming from him. Ortiz also smelled alcohol from a few feet away. Ortiz also observed that defendant was flustered, his skin was very red, and he was sweating.

2

All three witnesses next observed defendant as he reached into a bag and pulled out a bottle of vodka, poured it into a plastic cup, and drank. Zopefel eventually called police on her cell phone, as did Ortiz. While speaking to the 911 operator, Zopefel saw defendant get out of his car and walk down the sidewalk. He walked like he was drunk, swaying and staggering, and tripping at one point.

While staying on the phone with the 911 operator, Zopefel followed defendant with her car. Defendant eventually went up a driveway and entered a residence's backyard. Zoepfel stayed in her car until law enforcement arrived.

Orange County Deputy Sheriff Daniel Corwin arrived at the house and found defendant, who had his bag with him, lying on a hammock in the backyard. Corwin asked defendant if he lived there, and defendant said no. At Corwin's request, defendant went with him to the front of the house. Corwin noticed that defendant smelled like alcohol, and that he was unsteady on his feet and his speech was slurred.

Corwin then conducted numerous field sobriety tests on defendant, each of which indicated that defendant was intoxicated. Preliminary alcohol screening tests indicated defendant's blood-alcohol level was .156 and .159 percent. Taken together, Corwin concluded that defendant was intoxicated for purposes of driving. Corwin arrested defendant and obtained two additional breath samples, taken approximately half an hour after the initial tests, which reflected blood-alcohol levels of .21 and .20 percent.

In the meantime, another officer had arrived at the gas station and found defendant's car with the keys still in the ignition. The car was registered to Susan Gulbro.

On November 23, 2011, defendant was charged with driving under the influence of an alcoholic beverage (Veh. Code, § 23152, subd. (a); count one) and driving with blood-alcohol concentration of .08 or more after a previous conviction for gross vehicular manslaughter while intoxicated (Veh. Code, § 23152, subd. (b); count two). It was also alleged that defendant had a prior serious conviction for gross vehicular

3

manslaughter while intoxicated. (Pen. Code, [1] § 667, subds. (d), (e)(1), § 1170.12, subds. (b), (c)(1).)

The case initially went to trial in April 2012, with the issue of the prior conviction bifurcated. The jury was unable to reach a verdict on count one and found defendant not guilty on count two. A mistrial was declared on count one.

The instant jury trial began on May 7, 2012, with the issue of the prior conviction once again bifurcated. At trial, in addition to the percipient witnesses, the jury also heard testimony from Heather Lewis, a forensic scientist with the Orange County crime lab. She testified about how alcohol is absorbed into the bloodstream, how it is eliminated, and related matters. When presented with a hypothetical mirroring the facts of this case, she testified that it would have taken approximately 3.2 standard drinks that had not been absorbed into the bloodstream at the time of the first tests to account for the difference between the preliminary results and the results approximately half an hour later. When asked how many drinks would have been absorbed, but not eliminated, in order for defendant's blood-alcohol level to reach .205 percent, she testified approximately 14.6 standard drinks. She also testified that alcohol would have been eliminating itself from the body from the time the person stopped drinking (approximately 35 to 40 minutes before the preliminary tests) to the time of the later tests. Giving her most conservative estimate, Lewis opined the person would have had to drink approximately 15 to 17 standard drinks to account for that test result. Without knowing the exact time of driving, however, Lewis conceded it was possible that defendant was not intoxicated while driving the car.

On May 14, the jury convicted defendant on count one. Defendant admitted the prior. On June 1, the court sentenced defendant to six years in prison.

---

[1] All further statutory references are to the Penal Code.

II

DISCUSSION

*Insufficient Evidence*

When a defendant calls into question the sufficiency of the evidence, our review is a very limited one. "'""When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."'' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.) We presume the existence of every fact the trier of fact could have reasonably deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) This standard applies even "when the conviction rests primarily on circumstantial evidence." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)

Further, before we reverse a judgment for insufficiency of evidence, it must be clear there is no hypothesis under which we could find sufficient evidence. (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

Defendant argues that there is insufficient evidence to support his conviction for driving under the influence because none of the witnesses saw him drive or could say how long the car had been sitting in the gas station driveway. Therefore, he claims, it is possible that he consumed all the alcohol later found in his bloodstream while sitting in the driveway rather than while driving.

5

'"The question as to whether defendant drove the vehicle is a question of fact for the jury [citation] . . . ."' (*People v. Wilson* (1985) 176 Cal.App.3d Supp. 1, 7 (*Wilson*).)  Further, whether the defendant was driving may be established through circumstantial evidence.  (*People v. Hanggi* (1968) 265 Cal.App.2d. Supp. 969, 972.)

This is not a close call.  There was more than sufficient circumstantial evidence from which the jury could have concluded that defendant was intoxicated before his vehicle wound up in the gas station driveway.  The way he was parked was itself indicative that something was amiss — ordinarily, drivers do not park in driveways, blocking the ingress of other cars.  Further, the vehicle was damaged to the point where it could not be moved, a fact from which a reasonable jury could infer that defendant's intoxication and resultant poor driving caused the damage to the car.  The jury also had Lewis's testimony regarding the number of drinks it would have taken to reach defendant's level of intoxication, from which they could infer that defendant had been drinking for quite some time, including the period before he wound up in the gas station driveway.

In *Wilson*, the defendant was found asleep behind the wheel of a car parked on the shoulder of a freeway at an angle, protruding into a nearby lane.  (*Wilson, supra*, 176 Cal.App.3d Supp. at p. 3.)  The court held the jury could reasonably conclude that defendant had been driving while under the influence.  "Clearly, this was not a normal parking place or position for a vehicle to be stopped.  Moreover, the vehicle did not simply materialize at that location.  Obviously, someone drove it there.  [¶] That someone was defendant, according to the jury.  Defendant was the sole occupant of the vehicle. He was found seated in the driver's seat." (*Id.* at p. Supp. 8.)  Such is the case here.  The jury was entitled to conclude that defendant had driven the vehicle while intoxicated, damaged it, and wound up in the gas station driveway.  They were similarly free to reject the notion that defendant, while completely sober, during the middle of the day, damaged his vehicle to the point where it was not drivable in an accident that apparently did not

6

involve another car, chose to park the vehicle in a place that blocked others, and then proceeded to drink to the point of intoxication.

*Prosecutorial Misconduct*

Defendant next contends the prosecutor committed misconduct that requires reversal. He contends the prosecutor failed to adequately admonish two witnesses not to refer to excluded evidence.

Prior to trial, the prosecutor informed the court that he wanted to introduce the fact that defendant had removed a pair of bolt cutters from the car and threw them in the bushes before leaving the scene. The purpose of this evidence was to demonstrate that defendant was familiar with the car. After hearing argument, the court concluded the prosecutor could refer to the bolt cutters, but not during the prosecutor's case-in-chief.

Two witnesses did refer to the bolt cutters during the prosecution's case-in-chief. Ortiz was describing what happened after the witnesses saw defendant drink the vodka. The prosecutor asked what Ortiz observed afterward. Ortiz answered that defendant stepped out of the car. The prosecutor asked, "And what happened next?" to which Ortiz responded: "He pulled these bolt cutters from the back of his car." Defense counsel objected and moved to strike, which the court sustained, and the court immediately instructed the jury: "It has nothing to do with this case. Nothing for you to consider. It can be confusing. Just has nothing to do with this case. Just ignore that."

This issue was addressed between the court and counsel during a recess. The prosecutor had indicated to the court that he told Ortiz not to talk about the bolt cutters, advising him of this several times. He stated: "I actually told him quite a number of times that there was to be no discussion, that the court had made a ruling that it was misleading, and there was no point in bringing it up."

During cross-examination, Corwin testified that he had returned to the gas station later to ask the attendant about surveillance video. Defense counsel elicited

7

testimony from Corwin that he had testified otherwise at the first trial. On redirect, the prosecutor asked Corwin to explain his two different answers. Corwin responded: "Well, I remember talking to someone about the video, one of the gas station attendants when I [went] back. There was a pair of bolt cutters that —" Defense counsel objected, and the objection was sustained. During a recess, the court asked the prosecutor if he had admonished Corwin about references to the bolt cutters, and the prosecutor said he had done so during the first trial a month earlier. The court was concerned by the two separate references to the bolt cutters. The prosecutor stated he had not reminded Corwin about the bolt cutters because Corwin's testimony did not have anything to do with events at the gas station. The court instructed Corwin not to mention the bolt cutters again. After the recess, the court again instructed the jury that the reference to the bolt cutters was not evidence and the jury should not consider it for any purpose.

Prosecutorial misconduct violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citations.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Misconduct need not be intentional. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

A prosecutor commits misconduct by violating a court order to elicit inadmissible evidence. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Further, it is a prosecutor's responsibility to admonish and warn his or her witnesses about matters that cannot be mentioned while testifying. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.)

It is doubtful that the prosecutor here committed misconduct. In neither case did the prosecutor directly elicit forbidden testimony, and particularly with regard to Corwin, the prosecutor had no reason to anticipate the bolt cutters arising. With regard to

8

Ortiz, the prosecutor stated that he had given appropriate warnings, and we have no reason to doubt the word of an officer of the court. The most likely explanation is that an inexperienced witness simply neglected to follow instructions.

Further, even if we found that misconduct did occur, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) The bolt cutters were not a "smoking gun" in this case; indeed, they were not even collaterally relevant to the issues at hand, and both references were brief. Defendant argues that bolt cutters are inherently prejudicial because they are associated with criminal activity, and if this case was about burglary or theft, we might agree. But they were totally irrelevant to the issues before the jury in this case, specifically whether defendant was intoxicated at the time he drove. The bolt cutters were simply neither here nor there. It is also worth noting, of course, that bolt cutters do have legitimate uses, and there was no suggestion of other criminal activity by defendant. Further, "'[u]nder ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction. [Citations.]'" (*People v. Gurrola* (1963) 218 Cal.App.2d 349, 357.) That is precisely what happened here, and there is no indication that the brief bolt cutter references played any part in defendant's conviction. We therefore conclude any error was harmless beyond a reasonable doubt.

*Presentence Credits*

Defendant argues that equal protection principles require that the court award him additional presentence credits under the October 1, 2011 amendment to section 4019. Section 4019 permits prisoners awaiting sentencing for nonviolent crimes to reduce their period of confinement with conduct credit in addition to the credit they receive for the actual days spent in custody. (*People v. Brown* (2012) 54 Cal.4th 314, 317.) Before January 2010, defendants were entitled to two days for every four days of

actual time, or one for two, in presentence custody. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 (*Rajanayagam*).) Effective January 25, 2010, the statute was amended to allow two days of conduct credit for every two days of time served. (*People v. Garcia* (2012) 209 Cal.App.4th 530, 535-536.) The purpose of this new, accelerated formula was to reduce costs. (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 48.)

Effective September 28, 2010, a new formula went into effect due to an amendment to section 4019. The less generous one for two formula was restored. (Stats. 2010, ch. 426, §§ 1, 2, 5.) This credit formula was in effect when defendant committed the instant offense on July 18, 2011.

A new version of section 4019 went into effect in October 2011. The 2011 amendment to section 4019 increased the conduct credit formula under which prisoners earn two days of conduct credit for every two days of time served. The first sentence of section 4019, subdivision (h) provides: "The changes to this section . . . shall apply prospectively and shall apply to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011." The second sentence of subdivision (h) continues: "Any days earned by a prisoner prior to October 1, 2011 shall be calculated at the rate required by the prior law." (Stats. 2011, ch. 15, § 482.)

We concluded in *Rajanayagam*, *supra*, 211 Cal.App.4th at page 52, that principles of statutory construction require that the credits awarded in the October 2011 version of the statute be applied only prospectively. "[S]ubdivision (h)'s first sentence reflects the Legislature intended the enhanced conduct credit provision to apply only to those defendants who committed their crimes on or after October 1, 2011. Subdivision (h)'s second sentence does not extend the enhanced conduct credit provision to any other group, namely those defendants who committed offenses before October 1, 2011, but are in local custody on or after October 1, 2011. Instead, subdivision (h)'s second sentence attempts to clarify that those defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. However inartful the language of

10

subdivision (h), we read the second sentence as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law. [Citation.] To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence. [Fn. omitted.]" Thus, we reject defendant's claim that statutory interpretation requires we award him the additional credits.

Defendant also argues that principles of equal protection require awarding him conduct credits under the October 2011 version of section 4019 rather than the version in effect at the time he was sentenced. As defendant admits, we rejected that argument in *Rajanayagam*, *supra*, 211 Cal.App.4th at pages 53-56. We said: "We conclude the classification in question does bear a rational relationship to cost savings. Preliminarily, we note the California Supreme Court has stated equal protection of the laws does not forbid statutes and statutory amendments to have a beginning and to discriminate between rights of an earlier and later time. (*People v. Floyd* (2003) 31 Cal.4th 179, 188 (*Floyd*) ['[d]efendant has not cited a single case, in this state or any other, that recognizes an equal protection violation arising from the timing of the effective date of a statute lessening the punishment for a particular offense'].) Although *Floyd* concerned punishment, we discern no basis for concluding differently here." (*Id.* at p. 55.)

Defendant argues that because *Floyd* involved punishment rather than custody credits, it is inherently distinguishable. He offers no citations or detailed argument in support of this assertion. We disagree and once again conclude that equal protection principles were not violated by applying the statutorily mandated credits in defendant's case.

11

### III

### DISPOSITION

The judgment is affirmed.


                                        MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.