Filed 2/2/21  P. v. Morse CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY MORSE,<br><br>    Defendant and Appellant. | A158962<br><br>(Solano County<br>Super. Ct. No. FCR331989) |

Timothy Morse appeals from convictions of mayhem, battery with serious bodily injury and elder abuse not likely to produce great bodily injury.  The only disputed issues on appeal are claims of prejudicial prosecutorial error.  We will affirm the convictions.  As respondent concedes, however, the protective order issued by the trial court is invalid, and we will remand for reconsideration of that order under proper authority.

## BACKGROUND

In 2017, then 77-year-old Ben Greer was the owner of Ben's Cleanup Service and his son Ricky Greer worked with him.  On August 3, 2017, the Greers were working at the home of appellant's parents, Jim and Linda Morse, having been hired to clean up debris from areas around the house and

1

take items to the dump.[1]  Ricky was aware that appellant could be "difficult"
and they should "kind of stay away from him" because he heard Linda tell
Ben something to that effect.

Ricky testified that when they arrived, Jim walked around the front,
side, and back of the house with them, pointing out which of the many objects
were to stay and which were to be removed.  Linda said they would talk
about the garage after the areas surrounding the house were cleaned up, and
said the Greers should not remove appellant's tools or belongings from the
garage.  The garage contained stacks of "debris," and an "overabundance of
items" such that one could "hardly walk in there."

Ricky testified that while he was trying to clean up areas in front of the
house, appellant was "very" aggressive toward him, standing "right up next
to" him and making offensive statements including several times saying, "I'm
going to fuck you up."  Ricky had no idea why appellant was doing this and
ignored him.

It was a very hot day, and, after taking a load to the dump and doing
some more work at the house, the Greers went to the grocery store and
bought two cases of water, one of which Linda had asked them to get for her
since they were going.  When they returned, Jim was no longer present.
Ricky took one case of water into the garage and knocked on the internal door
to the house, then when Linda answered, either handed it to her or put it on
the floor just inside the door.  Linda had not told Ricky he was not allowed in
the garage or, if she had, he had not heard, and when he gave her the water

---

[1] When referring to the Greers individually, this opinion will use their
first names for convenience and clarity.  For the same reason, we will also
refer to appellant's parents by their first names.

she was "thankful" and did not seem irritated or indicate he was not supposed to be in the garage.

Ricky went out and began cleaning up at the side and back of the house. While he was working, appellant came and stood by him, holding a long steel rod with what looked like a nail attached to the end.

Ricky then saw appellant and Ben in front of the garage, appellant saying offensive things and swinging a baseball bat at Ben's head as Ben fended him off with his arms and pushed him back. Ricky told Ben to get away from appellant and they went into the garage to tell Linda what appellant was doing. Appellant came into the garage carrying a wood object about 24 or 28 inches long, pushed Ricky away, causing Ricky to fall on the ground, then leapt onto Ben and started beating Ben on the head with the piece of wood.[2] Ricky got up and tried to push appellant away from Ben. Appellant walked away but, as Ricky tried to help Ben up, appellant grabbed Ricky from behind by his hair, forcefully held one arm around his neck and repeatedly punched the side of Ricky's face with the other hand, breaking Ricky's glasses. The altercation ended with appellant moving away from the Greers, who went out to the back of their trailer. Ben was very disoriented and did not know where he was. Appellant came to the side of the trailer and looked inside, then returned to the front of the garage, looked at Ricky and apologized.

---

[2] Ricky later testified on cross-examination that when the assault occurred, he was in the garage to deliver the case of water to Linda, and Ben had come with him to talk with Linda about some belongings to be moved. Ricky testified that when the altercation occurred, Ben was not bending over to pick something up and the Greers had not removed anything from the garage.

The police arrived after 12 to 15 minutes, and an ambulance came for Ben. Ricky testified he did not tell the police appellant had a crossbow, but then acknowledged his voice on a recording saying this. Asked about another recording on which he said appellant used a crossbow "or some kind of weapon," Ricky testified, "Yeah, some kind of weapon. It doesn't necessarily has [*sic*] to be a crossbow." Ricky testified that appellant used some sort of weapon and "[i]f I called it a crossbow, maybe that's what I was saying under duress." The incident was shocking to Ricky because he had "never seen behavior that violent before out of one person just out of the blue." He acknowledged that the police reported back to him that no blood was found on a crossbow they found in the garage. Ricky thought he told one of the police officers that appellant had been swinging a bat at Ben in front of the garage prior to the assault inside the garage.

Ben's account was somewhat different from Ricky's. Ben testified that it took a couple of days to haul everything away from the Morses' house, the Greers did not go into the garage on the first day, and the assault occurred the next day, after they started clearing things out of the garage. Ben testified that as he was clearing a path to items he wanted to load first onto his trailer, appellant came into the garage and "smacked me upside the head with a two-by-four." The next thing he remembered was being in the hospital. The trial court took judicial notice of Ben's preliminary hearing testimony that he was picking up a box in the garage when he was struck; Ben did not remember this. Ben denied taking any tools out of the garage. He acknowledged that a photograph showed a hammer in his trailer bed but denied it was taken from the Morses. Ben testified he had not had problems with appellant prior to the assault and did not recall appellant swinging a baseball bat at him. He testified that Linda did not tell him appellant could

4

be difficult.  Several times during his testimony, Ben expressed having memory issues and said he was "still hurt."

As a result of the assault, Ben sustained four lacerations on the left side of his forehead and eyebrow and across the bridge of his nose, requiring a total of 15 sutures, and swelling of his left eye.  The assault dislocated an artificial intraocular lens that had been implanted in Ben's left eye in prior cataract surgery, and he had to undergo surgery to replace the dislocated lens with a new one.  The retina specialist who performed the surgery testified that without it, Ben would not have been able to see in that eye.  Ben had undergone several surgeries to repair his vision since the assault and at the time of trial in February 2019, he still could not see well with his left eye; he testified that he had only 30 percent of the vision he had previously had in that eye.  He had gotten a prescription for glasses a few weeks before trial but had not purchased the glasses because he thought they were too expensive.

Appellant's assault on Ricky left the right side of his face swollen and painful; his eye was swollen shut for about a week, then his vision was blurred for about two weeks.  His neck was sore for a couple of days.  He did not seek medical attention.  He was without glasses for five weeks after the incident.

Vacaville Police Officers Andy Stefenoni and David McDonald arrived at the Morses' house about 3:00 p.m. on August 3, 2017, in response to a call from Linda saying her son was in a physical altercation with two men who were helping the Morses move from the residence.  The officers made a "stealth approach" to the house because appellant had a history of fleeing from law enforcement.  When they arrived, appellant was inside the garage, "clearly visibly agitated," breathing rapidly and fists clenched.  When Officer

5

Stefenoni directed appellant to walk toward him, appellant "had that thousand-yard stare," looking intently at the officers, then at the victims. Appellant did not comply with instructions to approach and sit, and resisted the officers' attempts to handcuff him, resulting in use of a Taser. Stefenoni observed blood on appellant's shirt but no injuries on him.

Officer McDonald looked in the garage for a crossbow because Ricky mentioned one, and found a loaded crossbow "[a]mong all the clutter," but no blood was found on it. He looked for other things that could have been used as a weapon but "the area was so heavily littered with things that could have been a weapon, it was difficult to pinpoint any certain, specific thing." McDonald took two photographs of the area in the garage where there was the most blood, one of which was exhibit A, the photograph showing long cylindrical poles with discoloration at the tips.

**Defense**

Linda testified that she told the Greers nothing was to be taken away from the driveway and the garage. She went to the door between the kitchen and the garage when she heard someone knock and say, "We're back," and Ben told her appellant was being aggressive and she needed to call the police. Ben and appellant were both "[v]ery agitated." A fight broke out between appellant, Ben, and Rick, with all three punching, but Linda did not see who hit who first. She saw Rick go "down on the ground," then appellant's back was to her and "Ben was getting on [appellant] and they were just all fighting." She heard appellant say, "I told you not to touch my stuff." Linda got her phone and called the police, and screamed at the men to stop. She did not see appellant use any weapon during the fight, which lasted "[m]aybe five minutes."

6

Although she first testified that the three men started fighting at the same time, Linda acknowledged that she told the police dispatcher appellant was hitting the other men and that appellant was the "physical aggressor" in the incident. She acknowledged having told the police that appellant "went after" one and "the other one was trying to help the other one and he beat both of them up pretty good."

When the fight stopped, the Greers went outside to their truck and appellant stayed in the garage; Linda did not see him approach the Greers and apologize to them. Linda saw blood on the floor of the garage where appellant and Ben had been fighting. She testified that the metal poles shown in defense exhibit A were tent stakes that had been standing up against some crates prior to the fight, but in the photograph, were lying spread out on the ground. She did not see what caused the stakes to move.

Linda testified that she had asked the Greers to get her a case of water when she heard they were going to get some, but denied anyone had brought her the water before the fight and denied talking to Ricky about water. Linda testified that one of the reasons she hired the Greers was that they would not be intimidated by appellant. She testified that appellant was a "very gentle person" but could be aggressive and intimidate people by the way he looked at them. When she hired Ben, she told him appellant could be "difficult," and they had a conversation about Ben having a "difficult" sister. Appellant did not live with his parents but was frequently at the house and had belongings in the garage, and he did not want his belongings moved.

Jim also testified that he specifically told the Greers not to move items in the garage and driveway. Shown a photograph of items in Ben's trailer, Jim identified a hammer, a wiring conduit, and buckets containing faucet

valves as things that belonged to him and he had said were not to be removed. Jim was not present when the fight occurred.

Appellant was charged with four felonies—mayhem (Pen. Code, § 203)[3] (count 1), two counts of battery with serious bodily injury (§ 243, subd. (d)) (counts 2 [Ben] and 4 [Ricky]), one count of elder abuse likely to produce great bodily harm (§ 368, subd. (b)(1)) (count 3)—and one misdemeanor count of resisting a peace officer (§ 148, subd. (a)(1)) (count 5). It was alleged that appellant had suffered five prior prison priors (§ 667.5).

A jury found appellant guilty of mayhem, the two counts of battery with serious bodily injury, and, on count 4, the lesser offense of elder abuse not likely to cause serious bodily injury (§ 368, subd. (c)). The jury was unable to reach a verdict on the misdemeanor charge of resisting a peace officer and the trial court declared a mistrial as to that count and dismissed it. After a separate court trial, the court found one prison prior true. Appellant was sentenced to prison for a total term of nine years, consisting of the upper term of eight years on count 1 and a consecutive one-year term for the battery in count 4. The court stayed the sentences on counts 2 (upper term of four years) and 3 (180 days in county jail) pursuant to section 654, and struck the term on the prison prior pursuant to section 1385. The court issued a 10-year protective order requiring appellant to stay away from the Greers.

This timely appeal followed.

## DISCUSSION

Appellant's opening brief raises three issues, only one of which requires extended discussion.

---

[3] Further statutory references will be to the Penal Code unless otherwise specified.

Appellant's first contention, that he could not be convicted of both mayhem and battery causing serious bodily injury because the latter is a lesser included offense of the former under the "accusatory pleading" test, was withdrawn in his reply brief after respondent pointed out that only the statutory elements test may be used in determining whether multiple conviction is proper. (*People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229.) Appellant concedes battery with serious bodily injury is not a lesser included offense of mayhem under the statutory elements test because serious bodily injury is not an element of mayhem. (*People v. Poisson* (2016) 246 Cal.App.4th 121, 125; *People v. Santana* (2013) 56 Cal.4th 999, 1010.)[4]

Conversely, respondent concedes the merit of the third issue raised in appellant's opening brief. The protective order issued by the trial court cited section 136.2, subdivision (i)(1), as its authority, and stated that it protected both Ben and Ricky. Section 136.2, subdivision (i)(1), is inapplicable to the present case, as it refers to defendants convicted of "a crime involving domestic violence" or certain enumerated offenses *not including* the ones of which appellant was convicted.

---

[4] Under the accusatory pleading test, "if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed supra,* 38 Cal.4th at p. 1228.) The information alleged that appellant committed mayhem by "willfully, unlawfully, and maliciously strik[ing] B.G.'s eye, *causing loss of eyesight,*" and appellant argued that because loss of eyesight constitutes serious bodily injury, the mayhem charge included the element of serious bodily injury.

The statutory elements test requires that "the statutory elements of the greater offense include all of the statutory elements of the lesser offense" (*People v. Reed, supra,* 38 Cal.4th at p. 1228.) " '[O]nly a statutorily lesser included offense is subject to the bar against multiple convictions in the same proceeding. An offense that may be a lesser included offense because of the specific nature of the accusatory pleading is not subject to the same bar.' " (*Id.* at p. 1229, quoting *People v. Scheidt* (1991) 231 Cal.App.3d 162, 165–166.)

9

Appellant concedes, however, that the trial court had authority to impose a restraining order based on his misdemeanor elder abuse conviction pursuant to section 368, subdivision (*l*).[5]  Accordingly, appellant contends the case should be remanded to allow the trial court to reissue the protective order under the correct authority if it so chooses, but limited to protecting Ben, as no statute authorizes an order protecting Ricky.  Respondent agrees this is the proper course of action.

The disputed issue is appellant's contention that his convictions must be reversed due to prejudicial prosecutorial conduct in closing argument.  " ' " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.)  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ([*Espinoza*,] at p. 820.)' " (*People v. Hill* (1998) 17 Cal.4th 800, 819, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)  "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' ([*People v.*] *Marshall*

---

[5] Section 368, subdivision (*l*), provides:  "Upon conviction for a violation of subdivision (b), (c), (d), (e), or (f), the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court.  It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family.  This protective order may be issued by the court whether the defendant is sentenced to state prison or county jail, or if imposition of sentence is suspended and the defendant is placed on probation."

[(1996)] 13 Cal.4th [799,] 831), there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*Centeno,* at p. 667.)

Appellant contends the prosecutor improperly argued the jury could convict even with reasonable doubt, and shifted the burden of proof by arguing a not guilty verdict would mean the jury found reasonable the defense theory that Ben's injuries were sustained by falling against the poles. "It is . . . error to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340; accord, *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 (*Ellison*).) It is, and remains, the prosecutor's burden to prove the case. If the defense chooses to produce evidence, the jury must, of course, consider it as part of the complete record before it. To that end, the prosecution can surely point out that interpretations proffered by the defense are neither reasonable nor credible. Nevertheless, even if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden. The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own." (*Centeno, supra,* 60 Cal.4th at p. 673.) Thus, for example, a prosecutor's argument that the jury should "vote not guilty if ' "it's reasonable that the defendant is innocent" ' " improperly " 'attempted to lessen the People's burden of proof by arguing to the jury that the beyond-a-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable.' " (*Ibid.,* quoting *Ellison,* at pp. 1351, 1353.)

Here, after referring to defense counsel's argument about the high standard for reasonable doubt, the prosecutor argued: "But what didn't she talk about? · What the People don't have to prove. · The People don't have to prove that the defendant committed these crimes beyond all doubt. · We don't have to prove it beyond a hundred percent doubt. · Not a shadow of a doubt, not all possible doubt, not imaginary doubt, just beyond a reasonable doubt. [¶] Does that mean you don't have any doubts in your mind based on what you've heard that are reasonable in terms of the defendant's guilt? [¶] So *flip it on its head.* · For you to say the defendant is not guilty of this crime, you would say it's reasonable that Mr. Ben Greer got this injury by falling into some rebar." (Italics added.)

Defense counsel objected that this is "not the legal standard" and the trial court overruled the objection.[6] The prosecutor continued, "Or that it's not guilty because I think it's reasonable that the defendant's use of force here was reasonable in making Mr. Greer's eye become useless, all because the defendant may or may not have thought some property would have been

---

[6] Respondent's argument that appellant forfeited his challenge to these remarks by failing to object on the grounds he now raises on appeal, and request an admonition from the court, is not well-taken. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 481 (*Winbush*), quoting *People v. Samayoa, supra,* 15 Cal.4th at p. 841.) Here, defense counsel's objection that the prosecutor incorrectly stated the legal standard was sufficient to encompass his claims that the prosecutor improperly suggested the jury could convict if it had reasonable doubts and shifted the burden of proof to appellant. The purpose of the rule requiring objection in the trial court is to bring error to the court's attention so that it can be corrected. (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) The objection here served that purpose, and a request for an admonition from the court would have been futile in light of its overruling the objection.

harmed.  [¶] You listen to me say it and it sounds ridiculous because it is.
[¶] Now, don't forget your oath, that's to follow the law.  That means that just
because something is possible does not make it reasonable.  [¶] You must look
at all the evidence.  When you look at all the evidence, it only points one way,
and that's to the defendant's guilt."

Appellant contends the prosecutor's suggestion to "flip it on its head"
improperly urged the jury to determine guilt based on whether the defense
theory was reasonable.  We do not agree.  The prosecutor was not telling the
jury to flip the beyond a reasonable doubt standard on its head; he was
arguing appellant's defenses were not supported by the evidence and
therefore not a basis for reasonable doubt.[7]

It is not improper for a prosecutor to argue the defense theory of the
case is unreasonable.  (*Centeno*, *supra*, 60 Cal.4th at p. 673; *People v. Romero*
(2008) 44 Cal.4th 386, 416 [argument that reasonable doubt standard "asks
jurors to 'decide what is reasonable to believe versus unreasonable to believe'
and to 'accept the reasonable and reject the unreasonable' " did not lessen
prosecution burden of proof].)  The prosecutor emphasized the reasonableness
aspect of the reasonable doubt standard, reminding the jury he did not have
to prove guilt beyond *all* doubt, and argued that while defense counsel had
claimed the prosecution did not prove all the elements of the offenses, she did
not identify any element that was not proven.  The prosecutor did not suggest

---

[7] As to the defense of property theory, the prosecutor argued there was
no evidence of imminent harm or basis for concluding the amount of force
used was reasonable;  as to the defense that Ben fell into the poles, he argued
it was not reasonable to think such severe injuries could have been caused
this way and there was no evidence Ben actually fell into the poles, as no one
said this happened.[7]  The prosecutor also argued the defenses were
incompatible:  Was appellant defending his property with reasonable force, or
did Ben fall into the poles?

the jury had to find the defense reasonable regardless of the prosecution's case; he argued that the prosecution had proven its case and the proffered defenses were insufficient to create reasonable doubt because the theories were not supported by the evidence and "you have to reject unreasonable conclusions."

Appellant next argues the prosecutor improperly commented upon his failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). " '[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' (*Griffin*[, at p.] 615.) The prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1266.) The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1304.)" (*People v. Brady* (2010) 50 Cal.4th 547, 565–566.)

Appellant points to the prosecutor's argument that appellant "had no lawful reason to inflict these injuries on them. · None whatsoever. · There's nothing in the evidence whatsoever that identifies a legal justification for making it so Ben Greer can't see any more out of his left eye. [¶] You can't see why, because the defendant thought that they were taking his dad's stuff? · *Even though we actually have zero evidence on the record whatsoever of what the defendant actually thought. · We don't know what the defendant actually thought. · We just don't know.* · But the defense wants you to assume he thought something. · You cannot, you must not make assumptions in this case. · Your duties are to find the facts based on the evidence presented to you. · You can't find some facts that do not exist when there is no evidence

14

that supports it." (Italics added.) The italicized comments, appellant argues, improperly emphasized the absence of evidence only appellant's testimony could provide.

Appellant did not object to these comments and therefore forfeited a claim of misconduct based upon them. (*Winbush, supra,* 2 Cal.5th at p. 481.) Appellant argues no objection was required, and a request for admonition would have been futile, because the court had previously determined there was circumstantial evidence to support an inference appellant was aware the Morses' property was subject to imminent harm. The court had so determined in finding the evidence sufficient to support instructing the jury that a property owner may use reasonable force to protect that property from imminent harm (CALCRIM No. 3476). The prosecutor had argued this instruction should not be given because there was no evidence— circumstantial, prior statements, witness testimony—suggesting appellant thought any of his own or his father's property was subject to imminent harm or knew his father's property was in the Greers' trailer. Appellant's testimony, or lack thereof, was not a factor in this discussion. Given the different context of this discussion about the state of the evidence in general—and the court's conclusion that there was circumstantial evidence from which the jury could infer appellant was aware his or his family's property was at risk of imminent harm—we are not convinced the discussion and ruling on the jury instruction absolved defense counsel from objecting to a perceived violation of *Griffin* during argument. Moreover, any likelihood of the jury construing the prosecutor's remarks as comments on appellant's failure to testify—rather than on the state of the evidence in general—could have been addressed by clarification from the prosecutor and an admonition from the court.

15

Appellant next contends the prosecutor improperly disparaged defense counsel for fabricating the defense and used false evidence to support this claim. In his rebuttal, the prosecutor challenged the defense theory that appellant used reasonable force to defend property from imminent harm, arguing there was no evidence the Greers were about to leave or otherwise putting the Morses' property at risk at the time of the assault and, in any case, the amount of force used against Ben was not reasonable. Addressing the alternate theory that Ben was injured when he fell into the poles, the prosecutor stated: "Okay. So here is what happened: · You're looking at this after the fact, after the crime occurred, you have this photo, you see blood and you have to try and figure out, okay, how can we make this somehow a defense in this case. I know, let's say since those poles are on the ground near where the blood is . . . ."

Defense counsel objected that the prosecutor was engaging in "[i]mproper characterization and ridiculing" of her and the court instructed the jury, "to the extent you inferred that [the prosecutor] was personally demeaning [defense counsel], you are to disregard his comments as completely improper."

The prosecutor then stated, "I'm not talking about Ms. Garcia, I'm just talking about the general consent [*sic*] of trying to make this a defense in this case. [¶] Let's be very clear about that. · [¶] I have a lot of respect for Ms. Garcia. [¶] She's a great champion for her client. [¶] However, the general idea of you looking at this photo and you seeing, oh, so there is some metal poles on the ground right next to the blood, so let's just try and make something out of this, right, let's go ahead and say, oh, the victim must have fallen perfectly into these poles in such a way that it caused this humongous gash. [¶] And let's please be very accurate, right, that doctor from the ER, he

16

didn't say that falling into metal tent poles would cause these injuries, he said any blunt force trauma would cause these injuries. Blunt force trauma, that's what happened to Mr. Greer, caused by the defendant's hand. [¶] So rebar, ridiculous argument, don't fall for it. [¶] Don't forget there is zero evidence to support the argument. [¶] Zero. [¶] No one said that Mr. Greer fell into this. · [¶] It's just not there. [¶] That's just the defense wanting you to speculate and be distracted."

Defense counsel objected to the argument there was "zero evidence" and the court responded, "That's fair comment on the evidence. You got to argue it one way, he's arguing it another."

"Personal attacks on the integrity of opposing counsel can constitute misconduct. (*People v. Espinoza, supra,* 3 Cal.4th at p. 820.) 'It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.' (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) However, 'the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.' " (*Winbush, supra,* 2 Cal.5th at p. 484.)

To the extent the jury understood the prosecutor to be disparaging defense counsel by suggesting she fabricated the defense of Ben falling into the poles rather than being hit by appellant with a blunt object, the improper statement was immediately countered by both the court and the prosecutor. The prosecutor clarified that he was criticizing the defense theory, not defense counsel personally. And we presume the jury followed the court's

17

admonition to disregard any inference of personal disparagement. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 170.)

Appellant's contention that the prosecutor used false evidence is based on the prosecutor's statement that the emergency room doctor "didn't say that falling into metal tent poles would cause these injuries." Defense counsel had asked the emergency room doctor whether Ben's injuries were consistent with having fallen into the rods shown in Exhibit A, and the doctor had responded, "I would say yeah, any type of—you know, it's a blunt injury. So anything that struck his face could have caused those injuries." In her closing argument, defense counsel pointed to the photograph and doctor's acknowledgment that "these poles could have caused the injury" and argued Ben's injuries were "very consistent with having fallen into these metal pole stakes."

The prosecutor, responding to the defense argument, did not describe the doctor's testimony falsely; he described it literally. The doctor did not say the poles "would cause" the injuries but rather that the injuries were consistent with having fallen on the poles in that "any type" of blunt object "could have" caused the injuries. In other words, the doctor's testimony was more hypothetical than descriptive of the actual cause in the present case. The prosecutor's statement that there was "zero evidence" to support the defense expressly referred to the absence of evidence that Ben *in fact* fell into the poles: No one described having seen him do so, and Ben testified he did not. Overall, the prosecutor's argument was that it would be speculative to conclude Ben's injuries were caused by falling on the poles rather than by being hit with an object as the Greers described, and that the defense arguments to the contrary were not sufficient to create reasonable doubt.

Finally, appellant argues that the "multiple uncorrected errors of burden-shifting, misstatements of law and facts, and arguing false evidence" were prejudicial in combination, even if not individually. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill*, *supra,* 17 Cal.4th at p. 844.) Here, however, as we have rejected the claims of error that were not forfeited by appellant's failure to raise them at trial, the premise of the cumulative error argument necessarily fails.

## DISPOSITION

The matter is remanded for the trial court to consider whether to issue an order restraining appellant from contact with Ben Greer pursuant to section 368, subdivision (*l*).

                       _____

                       Kline, P.J.


We concur:


_____

Richman, J.


_____

Miller, J.


*People v. Morse* (A158962)